Melvin REID, et al., Plaintiffs,

v.

LOCKHEED MARTIN AERONAUTICS CO. and Lockheed Martin Corp., Defendants.

Farris Yarbrough, et al., Plaintiffs,

v.

Lockheed Martin Aeronautics Co., et al., Defendants.

Civ.A. Nos. 1:00–CV–1182–JOF, 1:00–CV–1183–JOF.

United States District Court, N.D. Georgia, Atlanta Division.

Aug. 2, 2001.

---

### ORDER

FORRESTER, District Judge.

These cases are before the court on Plaintiffs' motions for class certification.

### I. STATEMENT OF THE CASE

Plaintiffs filed these civil rights actions on May 10, 2000, alleging claims of employment discrimination against Defendants Lockheed Martin Aeronautics Company and Lockheed Martin Corporation (collectively referred to as "Defendants" or "Lockheed").[1] Plaintiffs in both actions bring the following claims on behalf of themselves and other similarly situated persons: (1) discrimination on the basis of race in violation of 42 U.S.C. § 1981; (2) discrimination on the basis of race, in the form of disparate treatment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981a

---

**1.** Plaintiffs in civil action number 1:00-CV-1183-JOF also named as Defendants the International Association of Machinists and Aerospace Workers, A.F.L.–C.I.O., as well as the Aeronautical Machinists Local Lodge 709 (collectively referred to as "the Union"). On May 22, 2001, however, Plaintiffs and the Union filed with the court a notice of proposed partial settlement. As such,

Plaintiffs urge the court to certify a class only as to their claims against Lockheed. *See* Pl. Mem. in Support of Class Cert., 1:00-CV-1183-JOF, at 2-3. The settlement agreement has not yet been approved by the court. *See* Fed.R.Civ.P. 23(e) (requiring court approval for dismissal or compromise of class action).

("Title VII"); (3) discrimination on the basis of race, in the form of disparate impact, in violation of Title VII; and (4) state law breach of contract. Plaintiffs Melvin Reid, Vonda Moore, Johnnie West, and Clarence Sinkfield (collectively referred to as "the *Reid* Plaintiffs") seek to bring these claims on behalf of certain black individuals employed by Lockheed on a salary basis. Plaintiffs Farris Yarbrough, Calvin Combs, Wendell Carlisle, Rita Oliver, Wayne Elliot, and Joseph Banks (collectively referred to as "the *Yarbrough* Plaintiffs") seek to advance these claims on behalf of certain black individuals employed by Lockheed on an hourly basis. Each of the aforementioned Plaintiffs is a present or former employee of Lockheed's facility in Marietta, Georgia. Each of the *Yarbrough* Plaintiffs is or was a member of the Aeronautical Machinists Local Lodge 709. Plaintiffs seek injunctive relief, front and back pay, lost fringe and pension benefits, compensatory damages for emotional distress, compensatory damages for pain and suffering, punitive damages, prejudgment interest, and fees and costs incurred in bringing these lawsuits.

As alleged in their complaints, Plaintiffs premise their employment discrimination claims on two distinct theories of liability: systemic disparate treatment (i.e., a pattern and practice of discrimination) and disparate impact. The *Reid* Plaintiffs allege that Lockheed engages in a pattern and practice of systemic discrimination against its black salaried employees that has resulted in disparities between those employees and their white counterparts in the areas of promotions, training and assignments, compensation, and performance evaluations. Moreover, this systemic discrimination has allegedly resulted in a hostile work environment and retaliation against black employees who exercise their rights. *See* Complaint, 1:00CV1182JOF, ¶¶ 23, 20, 2832; 4346. Similarly, the *Yarbrough* Plaintiffs allege that systemic discrimination against black hourly employees has resulted in disparities between white and black employees in the areas of promotions, training, and overtime, and has resulted in a hostile work environment and retaliation as well. *See* Complaint, 1:00CV1183JOF, ¶¶ 2-3, 27, 35-38, 51-57.

Plaintiffs filed the instant motions seeking class certification on May 9, 2001. In moving for class certification, Plaintiffs have more clearly described their claims. Plaintiffs assert that Lockheed maintains an overall corporate culture, originating at the highest levels of the corporation and flowing to all facilities operated by Lockheed Martin Aeronautics Company, that is openly antagonistic to its black employees. According to Plaintiffs, this culture has resulted in common and centralized policies and practices, related to human resources generally and areas such as training and compensation specifically, among the facilities run by Lockheed Martin Aeronautics Company. Plaintiffs assert that these policies and practices give supervisors, almost all of whom are white, wide discretion and autonomy in making personnel decisions, which in turn fosters racial discrimination in the areas of promotions, compensation, and performance evaluations. *See also* Pl. Reply, 1:00CV1182JOF, at 3, 4; Pl. Reply, 1:00CV1183JOF, at 34, 5 (stating that (1) Plaintiffs' disparate treatment claim is premised on contention that first level supervisors and managers are permitted too much discretion and have engaged in a pattern and practice of discrimination and (2) that Plaintiffs' disparate impact claim is premised on contention that subjective and discretionary systems have adverse impact on black employees). Additionally, Plaintiffs contend that the antagonistic culture at Lockheed has fostered racial discrimination by creating a racially hostile workplace. Using Lockheed's Marietta facility as an example, Plaintiffs contend that black employees: are generally kept out of management and supervisory positions, being retained instead in lower paying jobs; have little or no access to the promotions system because positions have not been posted and selections are based on subjective criteria; receive lower scores than white employees on performance evaluations;[2] are compensated in disparate propor-

---

2. Performance evaluations are not at issue with regard to the hourly employees.

tion with white employees; and are subjected to a racially hostile work environment.

The *Reid* Plaintiffs seek certification of the following classes:

(a) All African–American persons employed on a salary basis by Lockheed Martin Corporation at Lockheed Martin Aeronautics Company's Marietta facility (and feeder facilities) from May 10, 1996, to the present, who are or were subject to the Defendants' employment, personnel and human resources policies and practices and who have been, continue to be, or may in the future be adversely affected by the Defendants' racially discriminatory employment policies and practices;

(b) All African–American persons employed on a salary basis by Lockheed Martin Corporation at Lockheed Martin Aeronautics Company facilities in Marietta, Georgia, Palmdale, California, Ft. Worth, Texas, and Greenville, South Carolina, (and feeder facilities) from May 10, 1996, to the present, who are or were subject to the Defendants' employment, personnel and human resources policies and practices and who have been, continue to be, or may in the future be adversely affected by the Defendants' racially discriminatory employment policies and practices.

The *Reid* Plaintiffs additionally aspire to be representatives of the aforementioned classes and to have the following attorneys certified as class counsel: Josie A. Alexander; Johnnie L. Cochran; Hezekiah Sistrunk, Jr.; J. Keith Givens; and Angela J. Mason.[3]

Likewise, the *Yarbrough* Plaintiffs seek certification of the following classes:

(a) All African–American persons employed on an hourly basis by Lockheed Martin Corporation at Lockheed Martin Aeronautics Company's Marietta facility (and feeder facilities) from May 10, 1996, to the present, who are or were subject to the Defendants' employment, personnel and human resources policies and practices and who have been, continue to be, or may in the future be adversely affected by the Defendants' racially discriminatory employment policies and practices;

(b) All African–American persons employed on an hourly basis by Lockheed Martin Corporation at Lockheed Martin Aeronautics Company facilities in Marietta, Georgia, Palmdale, California, Ft. Worth, Texas, and Greenville, South Carolina, (and feeder facilities) from May 10, 1996, to the present, who are or were subject to the Defendants' employment, personnel and human resources policies and practices and who have been, continue to be, or may in the future be adversely affected by the Defendants' racially discriminatory employment policies and practices.

The *Yarbrough* Plaintiffs also aspire to be representatives of the aforementioned classes and seek to have attorneys Alexander, Cochran, Sistrunk, Givens, and Mason certified as class counsel.

Defendants filed responses in opposition to Plaintiffs' motions on June 25, 2001. With their responses, Defendants filed motions to exclude Plaintiffs' expert evidence. Additionally, Defendants objected to the admissibility of several affidavits filed in support of Plaintiffs' motions for class certification.

## II. DISCUSSION

### A. *Introduction*

Class certification is most warranted in the employment context where "racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Cooper v. Federal Reserve Bank,* 467 U.S. 867, 876, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984) (quoting *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (footnote omitted)) (discussing differences between class-wide suits and individual suits under Title VII). *See also Eastland v. Tennessee Valley Authority,* 704 F.2d 613, 618 (11th Cir.1983) (explaining what plaintiff must show to succeed in action alleging class-wide discrimination). Class certification is also warranted where maintenance as a class action constitutes the most efficient

---

**3.** After the filing of their motions for class certification, attorneys Michael D. Hausfeld and Joseph M. Sellers filed an entry of appearance on behalf of the *Reid* Plaintiffs.

means to remedy an overall pattern of discrimination. *See General Tel. v. Falcon*, 457 U.S. 147, 159, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (indicating that class action should advance "the efficiency and economy of litigation which is a principal purpose of the [class action] procedure") (internal quotations omitted). The class action device envisions that liability can be determined in a single trial, and it anticipates that members of the class are entitled either to identical relief or to relief so similar that little more than a calculator or formula is required to reach the result. *See Falcon*, 457 U.S. at 155, 102 S.Ct. 2364 (noting that "the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion.") (internal quotations omitted) (alterations in original). Where the alleged discrimination results from the actions of an individual employee, supervisor, or decision-maker, maintaining a lawsuit as a class action may not be appropriate.

In the initial days after the enactment of Title VII, class action law in the employment discrimination context developed in a culture where many employers completely excluded members of minority groups from positions and other job benefits at any but the lowest levels of the company. Statistical evidence showing such wholesale exclusion and deprivation easily established patterns and practices of discrimination because "nothing is as emphatic as zero." *Wade v. Mississippi Co-op. Extension Service*, 528 F.2d 508, 517 (5th Cir.1976) (quoting *United States v. Hinds County Sch. Bd.*, 417 F.2d 852, 858 (5th Cir.1969)).[4]

This culture of total exclusion explains the early development of class action law in the employment discrimination context. It is the nature of the law, in common law jurisdictions, to define itself by reference to the problems immediately at hand. Thus, a review of early Title VII decisions, which addressed a climate of overt and comprehensive discrimination, may encourage a belief that class certification is easily obtained. For example, the former Fifth Circuit repeatedly approved an "across-the-board" approach to class certification in cases alleging discrimination in employment. Under this approach, a plaintiff suffering a specific injury as a result of discriminatory policies could represent other class members suffering different injuries so long as those injuries resulted from the same discrimination injuring the plaintiff. *See, e.g., Payne v. Travenol Labs., Inc.*, 565 F.2d 895 (5th Cir.1978); *Johnson v. Georgia Highway Express, Inc.*, 417 F.2d 1122 (5th Cir.1969). As the culture has changed, however, and new statutes have been enacted, it has become apparent that class certification is no longer a nearly automatic outcome. *See Falcon*, 457 U.S. at 161, 102 S.Ct. 2364 (disapproving of "across-the-board" approach and holding that Title VII classes can be certified only after "rigorous analysis").

In contrast to the early days of Title VII, it is now more uncommon to find an employer that overtly encourages wholesale discrimination on the basis of race; race discrimination today usually comes in more subtle forms. It is perhaps more unusual still to find an employer such as a federal defense contractor—required by Executive Order 11246 and 41 C.F.R. § 602.1 to create and implement affirmative action programs, and whose employees are represented by a number of different unions—that can manage to engage in discrimination on a class-wide basis in the face of executive branch oversight and collectively-bargained grievance procedures through which issues of discrimination can be brought to light. Thus, the instant cases are brought in a societal milieu and employment environment notably different from those existing at the time Title VII was enacted and the first decisions under that statute were rendered. Furthermore, the amendments to Title VII enacted as a part of the Civil Rights Act of 1991, which ensure both the right to a jury trial and the right to compensatory and punitive damages, have materially changed the class certification analysis, as discussed below. Indeed, as the

---

**4.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions rendered by the former Fifth Circuit prior to October 1, 1981.

instant cases demonstrate, claims of employment discrimination inherently raise many hurdles that must be overcome before certification of a class action can be achieved. Plaintiffs here ultimately fail to overcome those hurdles.

### B. *Evidentiary Matters*

#### 1. *Expert Evidence*

Before explaining why class certification is not warranted in these cases, the court must address the evidentiary disputes raised by the parties. Defendants urge the court to exclude the expert opinions of Dr. Burt S. Barnow and Dr. Frank J. Landy under Federal Rule of Evidence 702, as interpreted in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny. Without addressing the full panoply of issues relevant to the *Daubert* analysis,[5] the court agrees that the opinions proffered by these experts are troublesome in several respects. For example, Dr. Barnow admitted in his deposition that his reports contain numerous errors including mathematical mistakes, the inclusion of wrong and misleading tables, counting as zeros disparities that really were not zeros, and missing an implied decimal that rendered some of the disparities incorrect and changed some of the variances.[6] *See* Barnow Depo., at 27-30, 238-39, 274-79, 281-83, 335-36, 364, 381-82, 460-64, 485, 491-92, 517-19, 539-40. Additionally, the court is concerned by Dr. Barnow's heavy reliance on assistants in completing his report. While there is nothing unseemly *per se* in an expert relying on his staff, Dr. Barnow seemed a bit uncertain as to which staff member actually performed which task. *Id.* at 117-19. Moreover, in his deposition, Dr. Barnow displayed a lack of familiarity with the data and source

documents for his report, as well as some of the processes by which that information was analyzed. *Id.* at 291-93, 300, 302, 335, 367, 369, 373-74, 455-57, 521-22. This becomes even more troublesome given Dr. Barnow's admission that he neither checked all of the computer codes used to analyze the data nor compared all of the numbers provided by his staff with the actual computer output. *Id.* at 26-27, 30-31, 113, 115-16.

Because Dr. Landy admittedly relied on Dr. Barnow's analyses in forming his conclusions, these same concerns arise with respect to Dr. Landy's opinions. *See* Landy Depo., at 76-77, 245-46, 296, 418-20, 430-31, 607, 645. More problematic still is that Dr. Landy did not have Dr. Barnow's full reports until after his own report had been completed. *Id.* at 248-56, 618-20. Also of concern is the fact that Dr. Landy's reports fail to cite sources for many of the factual assertions made therein, and Dr. Landy could not provide specific sources at his deposition. Finally, much of Dr. Landy's opinion concerns the work culture and climate at Lockheed's Marietta facility, even though he admittedly has never been to that facility or interviewed anyone at that facility. *Id.* at 105-06, 604, 649, 653.

The foregoing issues cause the court some concern with regard to the reliability of the reports produced by Dr. Barnow and Dr. Landy. Nonetheless, for present purposes of resolving Plaintiffs' motions for class certification, the court will consider their expert evidence. Defendants' motions to exclude Plaintiffs' experts will be HELD in ABEYANCE.

This is not to say that the court will consider all of the expert materials provided in these cases. Dr. Landy's supplemental report, dated July 9, 2001, and the amendments

---

**5.** Federal Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." In interpreting this rule, the Supreme Court has imposed a special gatekeeping role on trial judges, instructing them to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."

*Daubert*, 509 U.S. at 589, 113 S.Ct. 2786. The court does not at this time fully analyze the reliability and relevance requirements, nor does it mention all of the problems presented by the opinions of Plaintiffs' experts.

**6.** Dr. Barnow testified, however, that the implied decimal problem would not change the probability values, which he uses to determine whether or not a disparity is statistically significant. *See* Barnow Depo., p. 492.

to Dr. Barnow's reports, produced by Plaintiffs on July 19, 2001, will not be considered because they were not timely produced. Pursuant to this court's verbal order on April 18, 2001, subsequently memorialized in writing, Plaintiffs were to produce Dr. Landy's reports no later than May 7, 2001 and Dr. Barnow's reports no later than May 9, 2001. The court repeatedly informed counsel of its intention to keep on schedule in these cases, and it made clear that expert reports produced after the deadlines would not be accepted. It appears that Dr. Landy, at least, was made aware of the court's instruction in this regard, testifying that he understood that his original reports would not be supplemented for purposes of class certification and that he did not have any undisclosed opinions. *See* Landy Depo., at 89. When Dr. Barnow was deposed on June 5 and 6, 2001, roughly four weeks after his report was produced, he testified that he was not waiting on any additional information and had no plans to engage in any more analysis. *See* Barnow Depo., at 130-31, 287-88, 439. Despite the court's admonitions and the testimony just recited, Dr. Landy produced a supplemental report more than a month after his deposition. Similarly, almost two weeks after Dr. Barnow's deposition, and only one week before Defendants had to respond to Plaintiffs' class certification motions, Plaintiffs produced amendments to his reports. On these facts, the court finds that the supplemental and amended reports are untimely.

■ Plaintiffs' argument to the contrary is unavailing. Plaintiffs contend that Rule 26(e)(1) requires them to supplement incorrect or incomplete information and that they have until thirty days before trial to do so. The court agrees that Plaintiffs possess a duty under Rule 26(e)(1) to provide corrective information to their experts' reports and deposition testimony, and it acknowledges that the rule requires such information to be produced *at least* thirty days before trial. *See* Fed.R.Civ.P. 26(e)(1) (referencing time

provisions of Rule 26(a)(3)). Rule 26 does not, however, bestow upon litigants unfettered freedom to rely on supplements produced after a court-imposed deadline, even if the rule's pretrial time limit is satisfied. In short, Rule 26 imposes a *duty* on Plaintiffs; it grants them no *right* to produce information in a belated fashion.

■ The issues presented by Plaintiffs' motions for class certification, not to mention the concomitant issues concerning their reliance upon expert opinions, are complex. By producing the supplemental and amended reports when they did, Plaintiffs diminished Defendants' ability to pursue discovery on the amendments or to respond adequately to the morass of issues relating to class certification. Plaintiffs' offer to produce Dr. Barnow for deposition on June 20, 2001, *see* Ex. 1 to Pl. *Daubert* Resp., Mason Aff., at ¶¶ 7, 9, only two business days before Defendants' response was due, did not provide Defendants a meaningful opportunity to conduct discovery about the amendments. Moreover, Plaintiffs' assertion that Defendants "cross-examined" Dr. Barnow's research assistant, and therefore have no need for further discovery on this issue, demonstrates a fundamental insensitivity to the practical needs of counsel in a case of this sort. Plaintiffs permitted Defendants' counsel to speak by telephone with one of Dr. Barnow's research assistants. *Id.* at ¶¶ 11-13. Whatever may have transpired during that conversation, the answers to Defendants' questions were neither provided by Dr. Barnow nor made under oath. The court fails to see how these unsworn statements, made by someone other than the proffered witness, obviates Defendants' need to depose Dr. Barnow about the changes to his reports.[7] Additionally, Dr. Landy's supplemental report was produced after Defendants' response to class certification, and Defendants obviously have no opportunity to pursue discovery on any new information contained therein.[8]

---

7. It is clear from Dr. Barnow's rebuttal reports that he has revised certain of his prior analyses. *See, e.g.,* Ex. 3 to Pl. *Daubert* Resp., at 4-5 (discussing revised regression analyses concerning measure of tenure); Ex 4 to Pl. *Daubert* Resp., at 3-4 (same). To the extent that Dr. Barnow's rebuttal reports rely on data or analyses revised

or added since his deposition, they also will not be considered for purposes of class certification.

8. To the extent that Dr. Landy's supplement offers a point-by-point response to Defendants' *Daubert* motion, the court notes that such a task

## 2. Affidavits of Putative Class Members

Defendants also urge the court to disregard statements in several affidavits submitted by Plaintiffs on the bases that these statements are contradicted by the affiants' deposition testimony and/or constitute inadmissible hearsay. A comparison of the affidavits with the deposition testimony cited by the parties reveals that several statements contained in the affidavits are contradicted by the deposition testimony. Moreover, the depositions cast doubt on the accuracy of several other statements contained in the affidavits. Nonetheless, for present purposes of resolving Plaintiffs' motions for class certification, the court will not strike the affidavits of the putative class members. Where those affidavits are expressly contradicted by deposition testimony without explanation, however, the deposition testimony will control. *See Van T. Junkins & Assocs. v. U.S. Indus.*, 736 F.2d 656, 656 (11th Cir. 1984) ("[A] district court may find an affidavit which contradicts testimony on deposition a sham when the party merely contradicts its prior testimony without giving any valid explanation.")

## C. Class Certification Standard

Class determinations are governed by Federal Rule of Civil Procedure 23. "A class action may be maintained only when it satisfies all the requirements of Fed.R.Civ.P. 23(a) and at least one of the alternative requirements of Rule 23(b)." *Rutstein v. Avis Rent-A-Car Systems, Inc.*, 211 F.3d 1228, 1233 (11th Cir.2000) (quoting *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir.1997)). *See also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613–14, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). In addition to the requirements imposed by Rule 23, it is well settled in this circuit that "any analysis of class certification must begin with the issue of standing ...." *Murray v. Auslander*, 244 F.3d 807, 810 (11th Cir.2001) (quoting *Griffin v. Dugger*, 823 F.2d 1476,

1482 (11th Cir.1987)). *See also Carter v. West Publ'g Co.*, 225 F.3d 1258, 1262 (11th Cir.2000) ("A plaintiff who brings a Title VII action on behalf of a class must satisfy two prerequisites: (1) the named plaintiff must have standing to bring the claim, and (2) the requirements of Rule 23 must be fulfilled."). In determining the propriety of a class action, the court is not to consider the merits of the plaintiffs' claims. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Nevertheless, where necessary "to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim," the court may "probe behind the pleadings before coming to rest on the certification question." *General Tel. Co. v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). "The initial burden of proof to establish the propriety of class certification rests with the advocate of the class." *Avis*, 211 F.3d at 1233. Thus, Plaintiffs bear the burden of demonstrating that they have standing to bring the claims asserted on behalf of the class and that class certification is proper.

## D. Standing

The court begins its class certification analysis by addressing several issues related to Plaintiffs' standing to represent the classes proposed in their motions. First, the court concludes that the *Reid* Plaintiffs have not shown that they have standing to pursue Title VII claims arising prior to December 19, 1997 or § 1981 claims arising prior to May 10, 1998, and that the *Yarbrough* Plaintiffs have not shown that they have standing to pursue Title VII claims arising prior to February 26, 1998 or § 1981 claims arising prior to May 10, 1998. Second, the court concludes that, subject to the above temporal limits, there is at least one named Plaintiff in each case that has standing to bring the types of discrimination claims advanced in Plaintiffs' complaints.[9]

---

is the responsibility of Plaintiffs' counsel, not Plaintiffs' expert witness.

**9.** Defendants also challenge Plaintiffs' standing to represent multi-facility classes. The court finds that the multi-facility issue is more properly

one of commonality and typicality than of standing, and this issue will be addressed when the court examines the specific requirements of Rule 23(a).

### 1. *Statute of Limitations*

Defendants challenge Plaintiffs' ability to bring class claims arising as early as May 10, 1996, the date set forth in Plaintiffs' proposed classes. Title VII requires a plaintiff to file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the unlawful act. *See* 42 U.S.C. § 2000e–5(e). The earliest charge filed by any of the *Reid* Plaintiffs was that filed by Plaintiff Reid on June 16, 1998. *See* Reid Depo., p. 395 & Ex. 7; Def. Ex. 11. Thus, as Defendants point out, the limitations period on the *Reid* Plaintiffs' Title VII claims appears to reach only to December 19, 1997. The limitations period on the Title VII claims advanced by the *Yarbrough* Plaintiffs does not reach even that far. The earliest charge filed by any of the *Yarbrough* Plaintiffs was that filed by Plaintiff Carlisle on August 25, 1998. *See* Carlisle Depo., pp. 287-87 & Ex. 13.[10] Thus, the limitations period on the *Yarbrough* Plaintiffs' Title VII claims appears to reach only to February 26, 1998. Both of these dates are well after the May 10, 1996 date proposed by Plaintiffs, and Plaintiffs have not shown that they have standing to bring class claims preceding these dates. *See Carter*, 225 F.3d at 1263 (explaining that plaintiff can represent class members pursuant to single EEOC charge where "at least one plaintiff ... ha[s] *timely filed* an EEOC complaint" and "the individual claims of the filing and non-filing plaintiffs have arisen out of similar discriminatory treatment *in the same time frame*").[11]

Similarly, Plaintiffs have not established that they have standing to bring claims under § 1981 that reach back to May 10, 1996. Section 1981 does not contain a statute of limitations, and therefore "federal courts should select the most appropriate or analogous state statute of limitations." *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660, 107 S.Ct. 2617, 96 L.Ed.2d 572. In *Lukens*, the Supreme Court held that, as with claims under § 1983, federal courts adjudicating § 1981 claims should borrow the state statute of limitations governing personal injury actions. *See id.* at 661–62, 107 S.Ct. 2617. Accordingly, the two-year statute of limitations found in O.C.G.A. § 9-3-33 applies to Plaintiffs' § 1981 claims in these cases. *Cf. Mullinax v. McElhenney*, 817 F.2d 711, 715–16 & n. 2 (11th Cir.1987) (holding that two-year limitations period found in § 9-3-33 applies to § 1983 actions brought in Georgia district courts). Because these cases were filed on May 10, 2000, Plaintiffs' § 1981 claims reach back only to May 10, 1998, and they have not shown that they have standing to pursue class claims preceding this date.[12]

---

**10.** Attached as an exhibit to Plaintiff Banks' deposition is a charge of discrimination filed with the EEOC on November 4, 1996. *See* Banks Depo., pp. 470-71 & Union Ex. 10. The events described in this charge have already been litigated by Plaintiff Banks in a prior lawsuit. *See* Banks Depo., Union Ex. 1 & Union Ex. 2.

**11.** As Defendants point out, Plaintiffs' motions for class certification fail to mention any legal basis for their proposed date of May 10, 1996. Despite this failure, Plaintiffs make reference to the continuing violation doctrine in a footnote in their reply memoranda. *See, e.g.*, Pl. Reply, 1:00-CV-1182-JOF, at 8 n.14. Plaintiffs do not, however, develop their argument for applying the continuing violation doctrine to their Title VII claims. Rather, they merely cite to a discussion of the continuing violation doctrine made in a previous pleading that concerned different issues than those currently facing the court. *See* Pl.Ex. 104, Reply to Defendants' Response in Opposition to the EEOC's Motion to Intervene, at 5-7. Not surprisingly, the application of the continuing violation doctrine in the context of a class action is not fully addressed in the cited document. Because Plaintiffs raise the continu-

ing violation doctrine for the first time in reply, and because they have failed fully to brief the complex issues relating to that doctrine, the court will not consider the continuing violation doctrine for purposes of ruling on their motions for class certification. *See United States v. Georgia Dept. of Natural Resources*, 897 F.Supp. 1464, 1471 (N.D.Ga.1995) (Forrester, J.) ("This court will not consider arguments raised for the first time in a reply brief.").

**12.** Although Plaintiffs do not articulate the argument in either their motions or their reply briefs, a footnote in their Reply to Defendants' Response in Opposition to the EEOC's Motion to Intervene contended that the appropriate limitations period for claims under § 1981 is four years. *See* Pl.Ex. 104, at 5 (citing *Nealey v. University Health Services, Inc.*, 114 F.Supp.2d 1358 (S.D.Ga.2000) (Alaimo, J.)). In *Nealey*, the court applied the four-year statute of limitations found in 28 U.S.C. § 1658 to a claim brought under § 1981. *See Nealey*, 114 F.Supp.2d at 1364–66. Because Plaintiffs have not specifically argued with regard to the instant motions that § 1658 applies to their § 1981 claims, the court will not address

### 2. Types of Discrimination Suffered by the Named Plaintiffs

The court must also determine whether at least one named Plaintiff in each case has standing to bring the type of discrimination claims advanced in Plaintiffs' complaints, subject to the temporal scope defined above. *See Griffin v. Dugger,* 823 F.2d 1476, 1483 (11th Cir.1987) ("... [A] claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim."). As demonstrated, Plaintiffs advance claims of discrimination relating to promotions, training, performance evaluations (with regard to salaried employees), and compensation, as well as claims of a racially hostile work environment and retaliation. With regard to the *Reid* Plaintiffs, the court finds that at least one of the four named Plaintiffs has alleged an injury giving rise to each of the claims advanced in their complaint. *See* Complaint, 1:00-CV-1182-JOF, at ¶ 43 (alleging that Plaintiff Reid personally suffered racial discrimination with regard to promotions, compensation, evaluations, training, hostile environment, and retaliation); *id.* at ¶ 44 (alleging that Plaintiff Moore personally suffered racial discrimination with regard to compensation, evaluations, training, hostile environment, and retaliation); *id.* at ¶ 45 (alleging that Plaintiff West personally suffered racial discrimination with regard to compensation and training); *id.* at ¶ 46 (alleging that Plaintiff Sinkfield personally suffered racial discrimination with regard to promotions, evaluations, hostile environment, and retaliation). Also, because Plaintiff Moore remains employed by Lockheed, there exists a substantial likelihood that she will be affected by Defendants' alleged discrimination in the future, and she therefore has standing to seek injunctive relief. *See Wooden v. Board of Regents,* 247 F.3d 1262, 1283 (11th Cir.2001) ("... [T]o have standing to obtain forward-looking relief, a plaintiff must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future.").[13]

Similarly, with regard to the *Yarbrough* Plaintiffs, the court finds that at least one named Plaintiff has suffered an injury giving rise to the claims advanced in their complaint. *See* Complaint, 1:00-CV-1183-JOF, at ¶ 51 (alleging that Plaintiff Yarbrough personally suffered racial discrimination with regard to promotions, training, hostile environment, and retaliation); *id.* at ¶ 52 (alleging that Plaintiff Combs personally suffered racial discrimination with regard to promotions, training, overtime, hostile environment, and retaliation); *id.* at ¶ 53 (alleging that Plaintiff Kirkland personally suffered racial discrimination with regard to promotions, training, overtime, hostile environment, and retaliation); *id.* at ¶ 54 (alleging that Plaintiff Carlisle personally suffered racial discrimination with regard to promotions, training, hostile environment, and retaliation); *id.* at ¶ 55 (alleging that Plaintiff Oliver personally suffered racial discrimination with regard to promotions, hostile environment, and retaliation); *id.* at ¶ 56 (alleging that Plaintiff Elliot personally suffered racial discrimination with regard to promotions, retaliation, and compensation); *id.* at ¶ 57 (alleging that Plaintiff Banks personally suffered racial discrimination with regard to promotions, hostile environment, and retaliation). Additionally, it appears from their deposition testimony that Plaintiffs Yarbrough, Combs, Oliver, and Banks remain currently employed by Lockheed and have standing to pursue injunctive relief. *See* Yarbrough Depo., p. 102; Combs Depo., p. 73; Oliver Depo., pp. 91-92; Banks Depo., p. 54.

### E. Requirements of Rule 23(a)

Rule 23(a) allows maintenance of a class action only if all four of the following require-

---

that issue. Moreover, even if Plaintiffs had properly advanced such an argument, the court would find it unavailing. *See Madison v. IBP, Inc.,* 257 F.3d 780, 796–98 (8th Cir.2001) (finding that § 1658 does not apply to claims brought under § 1981); *Zubi v. AT & T Corp.,* 219 F.3d 220, 226 (3d Cir.2000) (same); *Chawla v. Emory Univ.,* No. 1:95–CV–0750–JOF, 1997 WL 907570, at \*12–14 (N.D.Ga. Feb. 13, 1997) (Deane, M.J.) (same), *adopted in relevant part by Chawla v.*

*Emory Univ.,* No. 1:95-CV-0750-JOF, 1997 WL 907571 (N.D.Ga. Mar. 31, 1997) (Forrester J.).

**13.** Plaintiffs Reid, West, and Sinkfield are no longer employed by Lockheed, *see* Reid Depo., p. 364; West Depo., p. 89; Sinkfield Depo., p. 28, and do not have standing to seek injunctive relief.

ments are satisfied: (1) "the class is so numerous that joinder of all members is impracticable"; (2) "there are questions of law or fact common to the class"; (3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class"; and (4) "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). These four requirements are known generally as numerosity, commonality, typicality, and adequacy of representation. *See Amchem,* 521 U.S. at 613, 117 S.Ct. 2231. For the following reasons, the court finds that Plaintiffs have not satisfied all of the requirements of Rule 23(a) and are not entitled to class certification.

### 1. *Numerosity*

■■■■ To satisfy the numerosity prerequisite, Plaintiffs must "show some evidence or reasonable estimate of the number of class members." *Grimes v. Pitney Bowes, Inc.,* 100 F.R.D. 265, 269 (N.D.Ga.1983) (Forrester, J.) (quoting 3B J. Moore & J. Kennedy, Moore's Federal Practice ¶ 23.05(3), at 23–61 (2d ed.1982)). Precedent in this circuit, however, holds that "[t]he basic question is practicability of joinder, not number of interested persons per se." *Garcia v. Gloor,* 618 F.2d 264, 267 (5th Cir.1980). Thus, mere numbers are not dispositive, and the court should consider such factors as "the size of the class, ease of identifying its members and determining their addresses, facility of making service on them if joined and their geographic dispersion." *Id.* Both Plaintiffs and Defendants agree that the numerosity requirement is met in these cases, and the court concurs. Evidence submitted by Plaintiffs shows that there were more than 300 black employees paid on a salaried basis, and more than 700 black employees paid on an hourly basis, at Lockheed's Marietta facility during the relevant time period. *See* Pl.Ex. 41, at 9; Pl.Ex. 83, at 7. Based on these figures, the court finds that the proposed classes contain a large number of members that would render joinder in one suit impracticable, despite their close geographic proximity to one another and any ease in identifying them. As such, the numerosity requirement is met.

### 2. *Commonality and Typicality*

In contrast to the numerosity requirement, the court concludes that the commonality and typicality requirements of Rule 23(a) are not satisfied in these cases. The Supreme Court has explained that the commonality and typicality prerequisites "tend to merge," and that "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon,* 457 U.S. at 157 n. 13, 102 S.Ct. 2364. The Eleventh Circuit has further explained that "commonality refers to the group characteristics of the class as a whole and typicality refers to the individual characteristics of the named plaintiff in relation to the class." *Prado–Steiman ex rel. Prado v. Bush,* 221 F.3d 1266, 1279 (11th Cir.2000).

■■■■ Although the court does not at this stage examine the merits of Plaintiffs' case, it may properly consider evidence relating to the discrimination allegedly suffered by the class, as well as the manner in which that evidence fits into the legal framework governing the claims pled in Plaintiffs' complaints. *See Nelson v. United States Steel Corp.,* 709 F.2d 675, 679 (11th Cir.1983). Commonality requires that "a class action ... involve issues that are susceptible to class-wide proof," *Murray,* 244 F.3d at 811, and the court must review the evidence to determine whether this requirement is satisfied. Moreover, "evidence relevant to the commonality requirement is often intertwined with the merits." *Nelson,* 709 F.2d at 679. In addition, with regard to typicality, the court must be able to determine whether the named Plaintiffs "possess the same interest and suffer the same injury as the class members." *Murray,* 244 F.3d at 811. In short, Plaintiffs' burden at this stage "entails more than the simple assertion of [commonality and typicality] but less than a prima facie showing of liability." *Nelson,* 709 F.2d at 680 (quoting *Gilchrist v. Bolger,* 89 F.R.D. 402, 406 (S.D.Ga.1981)). A review of the legal framework and the record evidence

leads the court to conclude that Plaintiffs have not carried their burden.

### a. *Plaintiffs' Claims*

As explained, Plaintiffs challenge Defendants' employment practices—relating to promotions, training, compensation, evaluations, hostile environment, and retaliation—under both disparate impact and disparate treatment theories.[14] To prove disparate impact, Plaintiffs will have to demonstrate that Defendants "use[ ] a particular employment practice that causes a disparate impact on the basis of race ...." 42 U.S.C. § 2000e-2(k). Plaintiffs, therefore, will have to identify "a facially neutral employment practice coupled with proof of its discriminatory impact." *See, e.g., In re Employment Discrimination Litig.*, 198 F.3d 1305, 1311 (11th Cir.1999); *Eastland v. TVA*, 704 F.2d 613, 619 (11th Cir.1983). Disparate impact is generally established by statistical evidence, which should "show that there is a legally significant disparity between (a) the racial composition, caused by the challenged employment practice, of the pool of those enjoying a ... job benefit; and (b) the racial composition of the qualified applicant pool." *In re Employment Discrimination*, 198 F.3d at 1312. Disparate impact claims do not require proof of discriminatory intent. *See EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1273 (11th Cir.2000). By contrast, "[i]n a disparate treatment case proof of discriminatory motive is essential." *Eastland*, 704 F.2d at 618. Statistical evidence often plays a vital role in establishing class-wide discrimination under a disparate treatment theory as well, and if sufficiently strong and compelling, it may establish discrimination by itself. *See Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1131 (11th Cir.1984); *Eastland*, 704 F.2d at 618. Additionally, Plaintiffs may offer anecdotal evidence to bolster their claims of disparate treatment. *See Eastland*, 704 F.2d at 618. Establishing commonality or typicality under a disparate treatment theory, however, is more difficult than doing so under disparate impact. *See Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1570 n. 10 (11th Cir. 1992); *Nelson*, 709 F.2d at 679 n. 9.[15]

### b. *Multi-Facility Classes*

Because all of the named Plaintiffs in these cases are current or former employees at Lockheed's Marietta facility, Defendants assert that Plaintiffs cannot bring claims on behalf of black employees who work at other facilities. The court has found no Eleventh Circuit decisions analyzing whether and when a plaintiff employed at one facility of a defendant may represent a class of employees at other facilities operated by the same defendant. The consensus among other

---

**14.** In their memoranda supporting class certification, Plaintiffs fail to include a discussion of the required elements of either their disparate impact or disparate treatment claims. Similarly, Plaintiffs make little effort to show how proving the elements of their individual claims will also prove the claims of the absent class members. The Supreme Court has made plain that "a Title VII class action, like any other class action, may only be certified if the trial court is satisfied, after a *rigorous* analysis, that the requirements of Rule 23(a) have been satisfied." *Falcon*, 457 U.S. at 161, 102 S.Ct. 2364 (emphasis added). Because commonality and typicality cannot be presumed, the court finds Plaintiffs' scanty discussion of these requirements troublesome.

In an apparent attempt to remedy these deficiencies, however, Plaintiffs have attached to their replies two "exhibits" showing why the named Plaintiffs' claims are typical to those of the class. *See* Pl. Reply, Ex. 103 & Ex. 110. These "exhibits" are nothing more than legal memoranda, each consisting of eleven pages of briefing followed by evidentiary attachments, which contain some of the very discussions that should have been included in Plaintiffs' supporting memoranda. Furthermore, these "exhibits" display a great lack of respect both for the rules of procedure and the orders of this court. The court limited Plaintiffs' reply briefs to ten pages. Plaintiffs may not avoid that limitation merely by appending their discussions of typicality to the end of the briefs and calling them "exhibits." The court STRIKES Exhibits 103 and 110 from Plaintiffs' replies and will not consider them in resolving the instant dispute.

**15.** Plaintiffs' claims under 42 U.S.C. § 1981, which can be violated only by intentional discrimination, may be advanced exclusively under a theory of disparate treatment. *See General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). "The elements of a claim of race discrimination under 42 U.S.C. § 1981 are ... the same as a Title VII disparate treatment claim in the employment context." *Rice–Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 843 n. 11 (11th Cir. 2000).

courts, however, is that a plaintiff may represent a multi-facility class only where centralized and uniform employment practices affect all facilities in the same way. *See, e.g., Stastny v. Southern Bell Tel. & Telegraph Co.,* 628 F.2d 267, 279–80 (4th Cir.1980); *Lott v. Westinghouse Savannah River Co.,* 200 F.R.D. 539, 555–56 (D.S.C.2000); *Zachery v. Texaco Exploration & Prod., Inc.,* 185 F.R.D. 230, 238–40 (W.D.Tex.1999); *Morgan v. United Parcel Service, Inc.,* 169 F.R.D. 349, 356 (E.D.Mo.1996); *Seidel v. General Motors Acceptance Corp.,* 93 F.R.D. 122, 124–25 (W.D.Wash.1981); *Webb v. Westinghouse Elec. Corp.,* 78 F.R.D. 645, 651 (E.D.Pa.1978).

A review of the decision in *Webb* proves instructive. In that case, the plaintiffs alleged that one of the defendant's business divisions, consisting of four separate plants in three states, discriminated against them on the basis of race in the areas of recruitment, hiring, training, and promotions. *See Webb,* 78 F.R.D. at 647–48. The four named plaintiffs, each of whom worked exclusively at the first plant, attempted to certify a class of all black persons employed by the division, regardless of the particular plant at which they worked. *Id.* at 648. The court rejected this attempt, however, finding that the evidence before the court did not establish centralized and uniform employment practices, but rather demonstrated that employment practices were set "by a plant manager located at each [division] facility." *Id.* at 651. Accordingly, the court held that the plaintiffs could represent only those black employees employed at the first facility, and it excluded from the class those black employees that worked at the other three facilities. *Id. See also Zachery,* 185 F.R.D. at 239–40 (refusing to certify multi-facility class where class consisted of seventeen business units, spread across fifteen states, each with varying degrees of local autonomy over employment decisions); *Seidel,* 93 F.R.D. at 124–25 (denying motion for certification of multi-facility class where evidence demonstrated that employment decisions were made at local branch level).

The facts of the instant cases are very similar to those in *Webb.* According to the record evidence in these cases, Lockheed Martin Corporation ("LMC") was formed in March 1995 by the merger of Lockheed Corporation and Martin Marietta Corporation. LMC is currently organized into five primary Business Areas: Systems Integration; Space Systems; Aeronautics; Technology Services; and Global Telecommunications. *See* Def. Ex. 2, McLaughlin Aff., at ¶ 3. When LMC was formed in 1995, the Aeronautics area, or sector as it was then called, was comprised of four primary facilities: Marietta, Georgia; Ft. Worth, Texas; Palmdale, California; and Greenville, South Carolina. *See* Pl.Ex. 8, Hancock Depo., at 16. Additionally, within the Aeronautics sector were four "feeder" facilities: Meridian, Mississippi; Pinellas, Florida; Clarksburg, West Virginia; and Johnstown, Pennsylvania. *See id.* at 26–27; Def. Ex. 6, Gill Depo., at 27. The facilities in Meridian and Clarksburg functioned as "feeders" for the facility in Marietta, and they were essentially operated as a department of the Marietta facility. *See* Def. Ex. 6, Gill Depo., at 27; Pl.Ex. 11, Hamlin Depo., at 157-58. In October 1999, the Greenville facility was moved out of Aeronautics and into Technology Services. *See* Pl.Ex. 8, Hancock Depo., at 111. From 1995 to 2000, each of the primary facilities in the Aeronautics sector had a president, who was the highest chief executive officer at that particular facility. *See id.* at 12, 70; Pl.Ex. 40; Def. Ex. 8, Burbage Aff., at ¶ 2. The facility-level president reported to the president of the Aeronautics sector, who in turn reported to the executive office of LMC. *See* Pl.Ex. 8, Hancock Depo., at 13-14.

During the period from 1995 to 2000, LMC issued Corporate Policy Statements and Corporate Functional Procedures, "documents used to convey management philosophy and direction" on the corporate level. *See* Pl.Ex. 19, at Y7 0002 00101. These corporate-level documents, however, constituted only broad-based statements to provide the lower-level units with an overarching philosophical framework in which to operate. The individual business units had the responsibility to implement that philosophical framework in whatever specific manner met their particular needs, and LMC did not monitor compliance with the corporate-level statements.

*See* Pl.Ex. 14, Powell Depo., at 108-10, 113-16, 165-66; Pl.Ex. 9, Gill Depo., at 34, 36, 88; Def. Ex. 5, Burbage Depo., at 19. Accordingly, the actual practices resulting from the corporate-level statements differed depending on the business unit in question. *See* Pl.Ex. 9, Gill Depo., at 36, 88. *See also* Def. Ex. 2, McLaughlin Aff., at ¶¶ 4-6 (stating that human resources data were maintained in decentralized and differing systems); Def. Ex. 8, Burbage Aff., at ¶ 4 (testifying that Marietta facility operated independently of other Aeronautics facilities and possessed its own personnel policies and procedures).[16] In fact, the particular practices of the individual companies forming LMC remained in place for some time before LMC even began issuing corporate policy statements. *See* Pl.Ex. 14, Powell Depo., at 214.[17]

On January 27, 2000, LMC underwent a reorganization designed to bring the three primary facilities of the Aeronautics sector, which had been operating as separate companies, under a single management structure. *See* Def. Ex. 5, Burbage Depo., at 38-39; Def. Ex. 8, Burbage Aff. at ¶ 4. On January 27, 2001, the President of the Aeronautics Business Area issued a memorandum declaring that the "transition period is now complete—we are now operating as one company." *See* Pl.Ex. 13. The record remains a bit ambiguous, however, on the amount of central control the Aeronautics area current-

ly has over employment practices. The entire Aeronautics area, and indeed all of LMC, currently has a common resume database and retrieval system, and there is now common training required for all Aeronautics employees. *See* Pl.Ex. 14, Powell Depo., at 131-34; Pl.Ex. 33, Drennan Depo., at 90-92. It also appears that there is a process in place to consolidate human resources and employment practices for the entire Aeronautics area. *See* Pl.Ex. 21, Bryant Depo., at 211-12; Def. Ex. 9 & 10. Labor relations, on the other hand, remain highly decentralized throughout LMC. There are currently 114 collective bargaining agreements between the various business units of LMC and 29 different national unions and 90 different local unions. Moreover, the particular local business unit of LMC constitutes the corporate signatory for each of these agreements. *See* Def. Ex. 4, Cantwell Aff., at ¶¶ 3-4.

The court finds that, at least until the reorganization of the Aeronautics area, the facilities at issue in these cases were not subject to centralized and uniform employment practices such that Plaintiffs have satisfied the commonality and typicality requirements with regard to multi-facility classes. As in *Webb*, the evidence shows that employment practices were established at the local level. Although there existed general corporate statements, the court

---

**16.** While Plaintiffs' expert, Dr. Landy, disagrees with the distinction between broad corporate policies and local implementations contained in the testimony of the fact witnesses, he admits that the local units implemented the corporate policies according to their needs. *See, e.g.,* Pl. Ex. 24, Landy *Reid* Rpt., at 14-15. Moreover, in opining that the variations in local implementation "appear trivial," Dr. Landy cites only to the testimony of John Gill and Dain Hancock that the local units must work within the broad guidelines established by the corporate statements. On the very pages cited by Dr. Landy, however, the witnesses testify that there is a difference between overarching corporate policies and local implementation, and that the actual practices may be implemented and administered differently. *See, e.g.,* Pl.Ex. 9, Gill Depo., at 34-36; Pl.Ex. 8, Hancock Depo., at 138. Additionally, in both his report and deposition, Dr. Landy concedes that there existed differences between the guidelines established by the corporate statements and the actual employment decisions made by local managers and supervisors. *See, e.g.,* Pl.Ex. 24,

Landy *Reid* Rpt., at 18-19; Landy Depo., at 300-02, 354-55, 416-17. Finally, the court notes that Dr. Landy often fails to cite specific sources for his factual assertions, and some of the evidence he does cite has not been provided to the court. For all of these reasons, the court finds Dr. Landy's opinions about the centralized nature of actual employment practices in the Aeronautics area to be unpersuasive and rejects those opinions for purposes of this analysis.

**17.** The documents submitted by Plaintiffs bear out the lack of specific corporate-level employment practices. For example, several of the Corporate Policy Statements made clear that they were optional for the LMC sectors. *See, e.g.,* Pl.Ex. 19, at Y7 0002 0086, Y7 0002 0089. Others contained only very general guidance and left to management the actual procedures to be implemented. *See, e.g.,* Pl.Ex. 85. Additionally, it is clear that the Marietta facility considered itself a separate unit, promulgating its own procedure for loaning personnel to or from "other [LMC] companies." *See* Pl.Ex. 28, at LM0022731.

finds that the actual implementation of the procedures visualized by those statements remained the province of the individual business units. Moreover, even now, labor relations are conducted independently by the various business units, with each local unit negotiating its own collective bargaining agreement with various national and local unions. This amount of local autonomy in the implementation and administration of actual employment practices, despite the existence of any broad policy statements at higher levels, counsels against the multi-facility class sought by Plaintiffs. *See Falcon,* 457 U.S. at 159 n. 15, 102 S.Ct. 2364 (noting that "Title VII prohibits discriminatory employment *practices,* not an abstract policy of discrimination") (emphasis in original).

Also counseling against Plaintiffs' ability to bring a multi-facility class is their core contention that the discrimination from which they suffered resulted from the discretion and autonomy given to first-level managers and supervisors. There is an inherent tension between Plaintiffs' arguments that the facilities in the Aeronautics area had common, centralized employment policies and their contention that local, first-level supervisors had the autonomy to make subjective, discriminatory decisions with regard to promotions, compensation, evaluations, and training. The best characterization of Plaintiffs' theory is that Defendants had a centralized policy of decentralization, which is insufficient on these facts to satisfy commonality or typicality with respect to Plaintiffs' proposed multi-facility classes.

The court acknowledges that a similar theory carried the day in *Morgan,* a case relied on by Plaintiffs. The court in that case found that the employer's system of allowing decentralized decision-making did not defeat certification of a nationwide class. *Id.* at 356. The facts of *Morgan,* however, easily distinguish that case from those *sub judice.* The defendant in that case had eleven geographical regions, headed by regional managers, that were each divided into six districts run by district managers. Each district was subdivided into divisions, each of which had several package operating divisions possessing several package operations centers. Author-

ity to promote employees at the division level and below was vested in the district managers. When making such decisions, each of the district managers used the same evaluation and promotion procedures, which were promulgated by defendant's national corporate office. *Morgan,* 169 F.R.D. at 353–54. Thus, unlike the instant cases, where Plaintiffs complain that first-level supervisors were given too much autonomy to make employment decisions independent of corporate or sector scrutiny, *Morgan* involved decisions made by relatively high-level managers pursuant to uniform procedures originating at the highest level of the corporation. The decentralized decisions in *Morgan* were actually fairly centralized.

Plaintiffs correctly assert that subjective employment practices may, under certain circumstances, give rise to a claim of discrimination. *See, e.g., Griffin v. Carlin,* 755 F.2d 1516, 1525 (11th Cir.1985) (noting that "subjective practices such as interviews and supervisory recommendations are capable of operating as barriers to minority advancement"). *But see Denney v. City of Albany,* 247 F.3d 1172, 1185 (11th Cir.2001) (explaining that subjective criteria are not *per se* improper and will not show pretext for legitimate employment decision "[a]bsent evidence that subjective hiring criteria were used as a mask for discrimination"). But this does not mean that subjective employment practices necessarily give rise to a broad, multi-facility class; rather, it leads to the opposite conclusion. As has been explained by another court: "The fact that [employment] decisions are handled by one's immediate supervisor based on subjective criteria would be useful evidence in an *individual* disparate *treatment* claim, but works against class *certification* of a disparate *impact* claim when the proposed class is subject to the same local autonomy in geographically dispersed facilities." *Zachery,* 185 F.R.D. at 238 (emphases in original). Similarly, "[g]eographically widespread facilities make it more difficult to prove a pattern and practice of disparate treatment." *Id.* at 239. *See also Stastny,* 628 F.2d at 279 (explaining that evidence of local subjectivity may bolster both individual claim and class-wide claim "in the very facility where the autonomy is exercised," but it

cuts against inference that multi-facility class was subjected to common discrimination).[18] Like the court in *Zachery*, this court finds that Plaintiffs' contention of first-level subjectivity, coupled with its findings that actual employment practices for the Aeronautics facilities were set at the local level, defeats certification of Plaintiffs' proposed multi-facility classes. *See Zachery*, 185 F.R.D. at 239 ("Delving into the practices of each local business unit and conceivably even into the individual decisions is precisely the type of individualized inquiry that class actions were designed to avoid."). Because none of the named Plaintiffs worked at any facility other than Marietta, and because both the evidence and Plaintiffs' own assertions show that actual employment practices were highly localized, the court finds that Plaintiffs have not established commonality or typicality with respect to the multi-facility classes for which they seek certification. Further discussion of the class certification issues relevant to these cases will be addressed only to Plaintiffs' proposed classes of black employees at the Marietta facility and its feeders.

### c. *Promotions and Training*

The evidence in these cases fails to demonstrate the requisite commonality and typicality for class certification under either a disparate impact theory or a disparate treatment theory. First, although Plaintiffs claim class-wide discrimination with regard to promotions and training, they have offered no statistical evidence to support those claims. Plaintiffs' statistics expert, Dr. Barnow, expressly testified that he had reached no conclusions and had formed no opinions about either of these subjects. *See* Barnow Depo., at 12, 21, 296, 298-99, 316, 396-97, 453-54. In fact, to the extent that Dr. Barnow attempted any analysis about promotions, he

testified that "there was no support for the claim of the plaintiffs, in the analysis we ran." *Id.* at 454. Dr. Landy similarly proffers no opinion with regard to discrimination in training at the Marietta facility. With regard to promotions, Dr. Landy does opine that the resume retrieval system utilized by Lockheed in filling work positions operates as a decision-maker of sorts by screening resumes based on various search codes, and he comments that this system has not been validated. *See* Pl.Ex. 24, Landy *Reid* Rpt., at 24-26; Pl.Ex. 87, Landy *Yarbrough* Rpt., at 23-25. In his deposition, however, Dr. Landy testified that he did not know exactly how Lockheed used the system, nor had he seen any data on the potential adverse effect of the system. *See* Landy Depo., at 90-92, 358-61. Dr. Landy also opines that there are common promotional practices that render all employees at the Marietta facility similarly situated. *See* Pl.Ex. 24, Landy *Reid* Rpt., at 26-28; Pl.Ex. 87, Landy *Yarbrough* Rpt., at 26-27. But Dr. Landy offers no conclusion that these practices had an adverse impact on black employees or that they were utilized systemically to treat blacks differently than whites. Finally, the anecdotal evidence submitted by Plaintiffs, which describes diverse events concerning different positions and training requests across a broad time period,[19] does not establish commonality and typicality in the absence of evidence tending to link these separate events to a class-wide problem. In short, Plaintiffs have not demonstrated their ability to prove that Defendants' promotions and training practices discriminated against black employees as a class, nor have they shown that their individual promotions and training claims are typical to the claims of the classes.[20]

---

18. The Supreme Court has identified discrimination by "entirely subjective decisionmaking processes," where established by "significant proof," as a claim that could conceivably justify certification of a class. *See Falcon*, 457 U.S. at 159 n. 15, 102 S.Ct. 2364. *Falcon*, however, neither addressed nor had any occasion to address the certification of a multi-facility class. *See id.* at 152 n. 5, 102 S.Ct. 2364 (reciting that district court in *Falcon* certified class of employees and applicants at defendant's division in Irving, Texas, "and no other division").

19. The affidavits submitted by Plaintiffs describe many claims, relating to promotions and training as well as compensation and evaluations, that are outside the limitations periods for which Plaintiffs have demonstrated standing.

20. It should be noted that commonality and typicality are particularly difficult to establish with regard to the promotions claims of the hourly employees. The record demonstrates that two collective bargaining units represent hourly employees at Lockheed's Marietta facility. *See, e.g.,* Barnow Depo., at 224-25; Landy Depo., at 174,

#### d. *Compensation*

■ In contrast to their promotions and training claims, Plaintiffs have offered evidence that Defendants' practices with regard to compensation significantly and adversely affected some black employees. That same evidence, however, also demonstrates that many black employees do not fall within the group significantly affected. In comparing compensation of hourly employees across a total of 43 different pay grades, using January 31 of each year from 1996 through 2000 as the date of comparison, Dr. Barnow found that only 12 out of a total of 164 comparisons, or 7.32%, resulted in a statistically significant disparity adverse to blacks.[21] *See* Barnow Depo., at 327-28. These significantly adverse disparities occurred in only six pay grades;[22] thirty-seven pay grades never had a statistically significant disparity adverse to blacks. *See* Pl.Ex. 83, Barnow *Yarbrough* Rpt., at 18-22. Also, the significantly adverse disparities decreased each year subject to comparison: six occurred in 1996, three occurred in 1997, two occurred in 1998, one occurred in 1999, and none occurred in 2000. *See* Barnow Depo., pp. 329, 330; Pl.Ex. 83, Barnow *Yarbrough* Rpt., at 18-22. In fact, the only statistically significant disparity occurring in 2000 favored black employees. *See* Barnow Depo., at 332; Pl.Ex. 83, Barnow *Yarbrough* Rpt., at 22. Dr. Barnow additionally testified that when one excluded the January 31, 1996 comparisons, which are outside both the limitations period for which Plaintiffs have demonstrated standing and the date given in their own class definition, the overall percentage of significantly adverse disparities equaled only 4.26%. This number is less than the percentage of significant disparities that he would expect to occur merely by chance. *See* Barnow Depo., at 330-31; Pl.Ex. 83, Barnow *Yarbrough* Rpt., at 2.

Dr. Barnow's comparison of compensation for hourly employees by job group similarly displays a wide variation in those groups significantly affected. Again using January 31 of each year from 1996 through 2000 as the date of comparison, Dr. Barnow compared compensation between black and white hourly employees in 25 job groups. In making these comparisons, Dr. Barnow found that 35 of 109 comparisons, or 32.1%, resulted in a statistically significant disparity adverse to blacks. *See* Pl.Ex. 83, Barnow *Yarbrough* Rpt., at 9.[23] While this overall number exceeds the percentage that Dr. Barnow would expect to occur merely by chance, Dr. Barnow's report reveals much variation between the job groups when each group is considered individually. For example, there were no statistically significant disparities in any of the five years with regard to any of the job groups labeled "Technicians" (i.e., job groups 04B, 04C, and 04D) or "Laborers" (i.e., job group 09A), as well as several other job groups. *See id.* at 11-16. Additionally, in several of the job groups that experienced statistically significant disparities, the disparities were not statistically significant for all years. This is also true with regard to Dr. Barnow's multiple regression analyses controlling for pay grade, which resulted in statistically significant disparities adverse to black employees

379-82. The *Yarbrough* Plaintiffs are all represented by the Aeronautical Machinists Local Lodge 709, and neither Dr. Barnow nor Dr. Landy read the collective bargaining agreement for the employees represented by the other collective bargaining unit. Barnow Depo., at 241-42; Landy Depo., at 176. A review of the agreements negotiated with these separate units demonstrates vastly different promotions procedures, meaning that employees working under one agreement will not be common to those working under the other. *Compare* Def. Ex. 68, at 72-77 *and* Def. Ex. 70, at 73-76 *with* Def. Ex. 69, at 31. Furthermore, since Local Lodge 709 represented each of the *Yarbrough* Plaintiffs, they were promoted under different procedures than those hourly employees represented by the other collective bargaining unit, meaning that their claims

are not typical to those employees in the other unit.

**21.** Dr. Barnow's reports explain that a statistically significant disparity is one where the probability value (or "P-value") is less than 0.05. *See* Pl.Ex. 41, Barnow *Reid* Rpt., at 2; Pl.Ex. 83, Barnow *Yarbrough* Rpt., at 2.

**22.** The six pay grades are: Factory GPR Grades 7, 11, 13, and 17; Georgia Plant Protection; and Tech & Office GPR Grade 15. *See* Pl. 83, Barnow *Yarbrough* Rpt., at 18–22.

**23.** While Dr. Barnow's report actually portrays this number as 33%, or 35 out of 107 comparisons, he testified that there were actually 109 comparisons. *See* Barnow Depo., at 278, 283.

in only three of the five years at issue. The multiple regression analyses controlling for job group, however, produced statistically significant adverse disparities for all years compared.[24]

As with the hourly employees, Dr. Barnow analyzed compensation for salaried employees by pay grade, job group, and using multiple regression analyses. In comparing compensation of salaried employees across 35 to 50 pay grades, using January 31 of each year from 1996 through 2001 as the date of comparison, Dr. Barnow found a statistically significant disparity adverse to blacks in 27 of 147 comparisons, equaling 18.4%. Dr. Barnow stated in his report that this number was more than the percentage one would expect to occur merely by chance, but as with the comparisons of hourly employees, there exists wide variation when the pay grades are examined individually. For example, eight of the comparisons resulted in a statistically significant disparity favoring blacks. Additionally, of all the pay grades compared, only eleven experienced a significant disparity adverse to blacks.[25] One pay grade actually experienced a statistically significant disparity favoring blacks during all five years in comparison. *See* Pl.Ex. 41, Barnow *Reid* Rpt., at 24-33. Similar variations are found in Dr. Barnow's job group comparisons. Although Dr. Barnow found a statistically significant disparity adverse to blacks in 38 of 112 comparisons, equaling approximately 34%, vast differences exist between individual job groups. Job group 01B, for example, titled "Executive & Middle Management Managers," experienced no significantly adverse disparities in any of the five years in comparison, while job group 02A, titled "Business Management," experienced such disparities in every year in comparison. Other groups experienced varying disparities. *See id.* at 15-22. The multiple regression analyses for salaried compensation resulted in statistically significant disparities for all five years. *See id.* at 34-35.[26]

Plaintiffs' statistical evidence relating to compensation shows neither commonality nor typicality. Rather, it shows that the experience of both hourly and salaried employees differed over time based on their pay grades and job groups. Black employees in pay grades or job groups for which there was never a statistically significant disparity adverse to blacks do not readily share common issues with black employees in pay grades or job groups where such a disparity existed. This is even more true for black employees in pay grades or job groups for which there were statistically significant disparities favoring black employees. Similarly, in light of the differences expressed in the statistical evidence, Plaintiffs have not shown that they are typical to those employees in the unaffected pay grades and job groups.[27]

24. Although considered by the court for purposes of the present inquiry, Dr. Barnow's regression analyses relating to hourly employees are problematic. Dr. Barnow testified that he was missing data for large percentages of the hourly employee population. *See* Barnow Depo., at 357–63. As such, the regression analyses show statistically significant disparities only for those employees included in the regressions. Dr. Barnow testified that the analyses did not show whether or not the group of employees included in the regressions are the same with regard to racial composition as the group of employees not included. *Id.* at 365–66. Dr. Barnow also testified that the large percentages of employees not included tempered his confidence in the analyses. *Id.* at 361.

25. The eleven pay grades are: SM004, SM005, SM006, SM008, SM0MH, SM0MM, SZ004, SZ007, SZ008, SZE07, and SZE10. *See* Pl.Ex. 41, Barnow *Reid* Rpt., at 24–33.

26. Dr. Barnow was missing data for approximately 40% of the salaried employees at the Marietta facility. *See* Pl.Ex. 41, Barnow *Reid* Rpt., at 34 n.14; Barnow Depo., at 505. As with the regressions for hourly employees, Dr. Barnow testified that he did not know the composition of the group of employees for which data were missing. He also testified that a possibility existed that the inclusion of the missing data could change his conclusions. *See* Barnow Depo., at 506–07.

27. As with promotions, the collective bargaining agreements negotiated by the two separate collective bargaining units at the Marietta facility contain different compensation provisions. *Compare* Def. Ex. 68, at 101-28 *and* Def. Ex. 70, at 100-29 *with* Def. Ex. 69, at 62-81. Accordingly, the same problems with commonality and typicality that affect the promotions claims of hourly employees also affect their compensation claims.

### e. *Performance Evaluations*

■ Because the *Yarbrough* Plaintiffs do not raise any claims of discrimination in performance evaluations, Dr. Barnow analyzed performance evaluations only for the salaried employees at the Marietta facility. In comparing average evaluation scores between blacks and whites across salaried pay grades from 1996 to 2000, Dr. Barnow found that 17 of 131, or approximately 13%, resulted in statistically significant disparities adverse to blacks. When each pay grade is considered individually, however, the results once again show wide variations. In fact, the only pay grade that consistently experienced a significantly adverse disparity in all five years was pay grade SM0MS. The other pay grades had varying disparities over time, and many pay grades showed no significantly adverse disparities at all. *See* Pl.Ex. 41, Barnow *Reid* Rpt., at 51-62; Barnow Depo., at 537. In comparing average evaluation scores by job group, Dr. Barnow found that 26 of 81 comparisons, or roughly 31%, resulted in statistically significant disparities adverse to blacks. As with the pay grade comparisons, however, only one job group experienced significantly adverse disparities over all five years. The other job groups experienced varying disparities over time, and many job groups showed no significantly adverse disparities at all. *See* Pl.Ex. 41, Barnow *Reid* Rpt., at 36-42, 49. In his multiple regression analyses, Dr. Barnow found statistically significant disparities adverse to blacks for all five years when controlling for pay grade, but such a disparity existed for only three of the five years when controlling for job group. *See id.* at 4-5, 63.[28]

Plaintiffs' statistical evidence relating to performance evaluations, like that concerning compensation, does not demonstrate commonality or typicality. As with compensation, the evidence reveals wide variations over time depending on job group and pay grade. Similarly, Plaintiffs' anecdotal evidence does little to bolster their claims of class-wide discrimination with regard to evaluations. Most of the statements in the relevant affidavits pertaining to evaluations merely complain that the affiant received scores lower than he or she thought should have been given, without any reference to a similarly situated white employee who received better scores. Thus, most of the affidavits show only that the affiants were displeased with their evaluations, not that the evaluations resulted in racial disparities or resulted from racial animus. Plaintiffs, in short, have not shown that their evaluations claims are susceptible to common proof, nor have they linked their own injuries in this regard to the injuries suffered by the broad classes they seek to represent.

### f. *Hostile Environment and Retaliation*

■ Plaintiffs make no serious effort to explain how their claims of hostile work environment and retaliation satisfy the commonality and typicality requirements of Rule 23(a). Plaintiffs' hostile environment claim will require Plaintiffs to "demonstrate that the actions of the defendants altered the conditions of the workplace, creating an objectively abusive and hostile atmosphere." *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir.1995) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Additionally, Plaintiffs will have to show that the victims of this hostile environment subjectively perceived it to be abusive. *See Harris*, 510 U.S. at 21–22, 114 S.Ct. 367. *Cf. Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir.1999) ("Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component."). Furthermore, to establish their hostile environment claims on a class-wide basis—i.e., that a racially hostile work environment was Defendants' "standard operating procedure,"—Plaintiffs will need to show "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory events." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

---

28. Dr. Barnow was missing data for approximately 45% of the salaried employees in these regressions. *See* Pl.Ex. 41, Barnow *Reid* Rpt., at 63 n.19; Barnow Depo., at 543. Thus, the same problems noted earlier with regard to missing data would apply to these regressions as well.

It should be noted that not all offensive conduct constitutes a hostile work environment under Title VII. Indeed, the "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher v. Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). This means that employees must tolerate a certain amount of boorishness, ignorance, and offensive behavior from those individuals with whom they work. It is only when the offensive conduct is so severe and pervasive that it alters the conditions of the victim's employment and creates an abusive working environment that the law is violated. *See Harris,* 510 U.S. at 21, 114 S.Ct. 367. The racially offensive conduct must permeate the victim's workplace. *See Edwards,* 49 F.3d at 1521 (explaining that, to succeed on racially hostile environment claim, plaintiff would need to show that offensive conduct was "so commonplace, overt and denigrating that [it] created an atmosphere charged with racial hostility.") (internal quotations and citation omitted). Whether or not harassing behavior objectively alters the conditions of employment requires consideration of: the frequency of the conduct; the severity of the conduct; whether the conduct is physically threatening or humiliating or merely an offensive utterance; and whether the conduct unreasonably interferes with the victim's job performance. *See Harris,* 510 U.S. at 23, 114 S.Ct. 367; *Edwards,* 49 F.3d at 1521-22. In short, hostile environment claims are extremely fact-intensive, *see Mendoza,* 195 F.3d at 1246, and they require a showing of intentional discrimination after a consideration of the totality of the circumstances. *See id.* These factors weigh against a finding of commonality and typicality.

After reviewing the anecdotal evidence submitted by Plaintiffs, the court cannot find that the various acts allegedly constituting harassment are common among members of the putative classes or typical to the harassment suffered by the named Plaintiffs. As an initial matter, a significant portion of the affidavits submitted by putative class members do not even complain about a hostile work environment, severely weakening Plaintiffs' assertions of commonality and typicality as to their claims of harassment. Additionally, as with the complaints regarding promotions, training, compensation, and evaluations, many of the incidents of hostile work environment described in the affidavits are outside the limitations periods for which Plaintiffs have demonstrated standing. Of those that are within the limitations periods, the evidence shows several different allegations of harassment. For example, Plaintiff Reid complained that he saw "racially hostile graffiti" in the restroom. *See* Reid Aff., at ¶ 27. Plaintiff Moore testified that she was watched and monitored constantly even though her white co-workers were not, and that some of her co-workers displayed Confederate flags at their work stations. *See* V. Moore Aff., at ¶ 27. Plaintiff West complained that he had to document his overtime and relinquish his driving pass even though white co-workers were not treated similarly. *See* West Aff., at ¶ 22. Plaintiff Combs testified that he was subjected to racial jokes and slurs on several occasions and was once shown a "Back to Africa" ticket. *See* Combs Aff., at ¶ 17. Plaintiff Elliot complained of several references to a "Back to Africa" ticket, several racial slurs, and one instance where a co-worker displayed a noose for two weeks. *See* Elliot Aff., at ¶ 18. Putative class member Floyd Baxter stated that he overheard a supervisor refer to a black employee as "nigger" on one occasion. *See* Baxter Aff., at ¶ 16. Putative class member Anthony Cook stated that, on one occasion, a white co-worker sprayed disinfectant at him. *See* Cook Aff., at ¶ 14. Putative class member Garfield Baptiste complained about one incident where a white co-worker told him that blacks cannot paint as well as whites. *See* Garfield Aff., at ¶ 15. Putative class member Marvin Barber stated that he was approached on two occasions by co-workers with Ku Klux Klan paraphernalia, including a "Klu [sic] Klux Klan knife," and that it was common for white supervisors in his area to refer to blacks as "niggers," "monkeys," or "apes." *See* Barber Aff., at ¶ 17.

These examples demonstrate that the actions constituting the alleged hostile environ-

ment occurred with varying frequency and possessed varying degrees of severity. Moreover, the events described in the affidavits tend to focus on individual actions rather than show an overarching policy of subjecting blacks as a group to a common hostile work environment. The court does not see a common discriminatory pattern in the affidavits submitted by Plaintiffs, and those individuals who have complained only about the occasional, sporadic acts of co-workers are not typical of other individuals who described much more severe and pervasive conduct.[29] Plaintiffs have made no attempt to explain how their hostile environment claims can be proven on a class-wide basis given that many members of the class did not experience harassment and that those who did complained of harassment in various forms. Based on the record, and Plaintiffs' failure to engage in any discussion that their harassment claims are susceptible to class-wide proof, the court cannot find that commonality and typicality have been satisfied with respect to such claims.

■ Similarly, the court finds that Plaintiffs have failed to demonstrate commonality or typicality with respect to their retaliation claims. As with their hostile environment claims, Plaintiffs' claims of retaliation are fact-intensive and require a showing of intentional discrimination. *See Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir.1998) (stating that plaintiff alleging Title VII retaliation must show causal relation between statutorily protected activity and adverse employment action). Plaintiffs point to no evidence whatsoever supporting a claim of class-wide retaliation. Based on the record, and Plaintiffs' failure to engage in any discussion that their retaliation claims are susceptible to class-wide proof, the court cannot find that the commonality and typicality re-

quirements have been satisfied as to these claims.

g. *Plaintiffs' Assertions of Discretionary Decision-making*

■ In support of their motions for class certification, Plaintiffs cite to several decisions for the proposition that classes are properly certified in employment discrimination cases where it is shown that the decision-making processes are subjective. The cases cited by Plaintiffs are distinguishable and do not bolster Plaintiffs' claims of commonality and typicality in the instant cases. For example, in *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546 (11th Cir.1986), where the court found erroneous the decertification of a class of female employees alleging gender discrimination, the employer had a policy of "overt workforce sex discrimination." *Id.* at 1551. Pursuant to this policy, the higher-paying jobs in the employer's production plant were deliberately reserved for men, and women were confined to lower-paying non-plant jobs. This system was maintained by word-of-mouth hiring; there was no posting or announcing of vacancies, nor was there a bidding process or formal job applications. There were also no written selection criteria. *Id.* at 1551–52. In other words, "the system was one of *entirely* subjective evaluation." *Id.* at 1552 (emphasis added).

In the instant cases, by contrast, Plaintiffs have shown neither an overt policy of discrimination nor that the promotions, training, compensation, and evaluations systems the Marietta facility were entirely subjective. The collective bargaining agreements for hourly positions, as well as certain management directives for salaried positions, introduced at least some objective criteria with regard to compensation and promotions. *See generally* Def. Ex. 29, Hamlin Depo., at ex. 7;

---

29. The fact that many of the Plaintiffs complain about the acts of co-workers rather than supervisors could affect their typicality to the class and their adequacy to represent the class in a hostile environment claim. *See Falcon*, 457 U.S. at 157 n. 13, 102 S.Ct. 2364 (explaining that commonality and typicality tend to merge not only with each other, but with the adequacy of representation requirement as well). An employer is strictly liable for harassing conduct if the harasser is a

supervisor and took a tangible employment action against the victim as a result of the harassment. *See Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 509 (11th Cir.2000). If the harasser is not a supervisor, however, the employer is only liable if it "knew (actual notice) or should have known (constructive notice) of the harassment and failed to take remedial action," which is significantly more difficult to prove. *Id.* at 510.

Def. Ex. 33, Bagerski Depo., at ex. 3, 11, 12; Def. 68, at 72-77, 101-28; Def. Ex. 69, at 31, 62-81; Def. Ex. 70, at 73-76, 100-29. Moreover, the statistical evidence shows that whatever subjective processes were utilized, they did not affect all black employees in similar ways.

Plaintiffs also cite the non-binding decision in *Caridad v. Metro–North Commuter R.*, 191 F.3d 283 (2d Cir.1999). This case is also distinguishable. In *Caridad*, the plaintiffs alleged that the defendant's disciplinary procedures and promotions policy vested too much discretion in department supervisors, resulting in discrimination against black employees. The court reversed the district court's denial of class certification for failure to meet commonality and typicality, concluding that subjective decision-making did not automatically preclude a finding that those requirements were satisfied. The court explained, however, that "class certification would not be warranted absent some showing that the challenged practice is causally related to a pattern of disparate treatment or has a disparate impact on African-American employees ...." *Id.* at 292. The court also commented that "[w]here the decision-making process is difficult to review because of the role of subjective assessment, significant statistical disparities are relevant to determining whether the challenged employment practice has a class-wide impact." *Id.* Noting that the statistical evidence showed significant disparities with regard to discipline in 48 of 69 work positions and that being black reduced the likelihood of promotion by 33%, the court concluded that the evidence supported a finding of commonality and typicality as to promotions for all black employees and as to discipline for black employees in the relevant 48 positions. *Id.* at 292–93.

Unlike *Caridad*, the statistical evidence in the instant cases demonstrates wide variations in disparities depending on job group, pay grade, year of comparison, and the particular claim for which relief is sought. Additionally, unlike either *Cox* or *Caridad*, Plaintiffs in these cases seek relief for hostile environment and retaliation claims for which there appears to be no class-wide proof. The addition of these claims, and the broad class definitions proposed by Plaintiffs, make the instant cases look more like improper "across-the-board" classes than the narrowly focused classes at issue in *Cox* and *Caridad*. *See Washington*, 959 F.2d at 1569–70.

As noted earlier, the Supreme Court has indicated that "entirely subjective decision-making processes" may "conceivably justify" certification of a broad class when the claim is supported by "significant proof." *See Falcon*, 457 U.S. at 159 n. 15, 102 S.Ct. 2364. Plaintiffs have not submitted "significant proof" that the decision-making processes at Lockheed's Marietta facility were entirely subjective, that these processes resulted in statistically significant disparities for all black employees regardless of job group or pay grade, or that these processes were part of a general policy of intentional discrimination. Simply put, Plaintiffs have not shown "the existence of an identifiable employment pattern, practice or policy that demonstrably affects all members of a class in substantively, if not completely, comparable ways." *Stastny*, 628 F.2d at 273. Despite the discretion allegedly given to first-level supervisors, the court cannot find commonality and typicality on this record for the expansive classes Plaintiffs seek to represent. As explained by the Supreme Court:

> Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion [or other job benefit] on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claims and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims.

*Id.* at 157, 102 S.Ct. 2364. *See also Morrison v. Booth*, 763 F.2d 1366, 1371 (11th Cir. 1985) (indicating that plaintiffs may not "simply leap from the premise that they were the victims of discrimination to the position that others must have been"). In the instant cases, Plaintiffs have not bridged that gap.

### h. *Summary*

For the foregoing reasons, the court finds that Plaintiffs have not satisfied Rule 23(a)'s

commonality and typicality requirements. The evidence shows that the actual employment practices in Lockheed's Aeronautics area were developed and implemented on the local level, and Plaintiffs have not shown commonality and typicality with respect to employees at facilities other than Marietta. With regard to the Marietta facility, Plaintiffs have offered no evidence that their promotions, training, hostile work environment, or retaliation claims are susceptible to class-wide proof or are typical to the proposed classes. Moreover, Plaintiffs' statistical evidence relating to their compensation and evaluation claims demonstrates that those claims are not common or typical. Finally, Plaintiffs' assertions of discretionary and subjective decision-making do not satisfy the commonality and typicality requirements in the instant cases.

### 3. Adequacy of Representation

The Eleventh Circuit has explained that "[t]he adequate representation requirement involves questions of whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation, and of whether plaintiffs have interests antagonistic to those of the rest of the class." *Griffin v. Carlin,* 755 F.2d 1516, 1533 (11th Cir.1985). *See also Falcon,* 457 U.S. at 157–58 n. 13, 102 S.Ct. 2364 (indicating that adequacy requirement "raises concerns about the competency of class counsel and conflicts of interests"). The court notes that, even though it is their burden to prove adequacy of representation, Plaintiffs' motions do not cite to a single piece of record evidence in support of their assertions that this requirement is satisfied.[30] This failure does little to allay those concerns of the court, expressed to Plaintiffs' counsel on prior occasions, about the manner in which these cases have been prosecuted by Plaintiffs. For example, counsel's mismanagement of expert discovery nearly resulted in Plaintiffs' experts being

stricken, and there has been more than one episode during this litigation where the attorneys for Plaintiffs appeared to be less than adequately prepared. Nonetheless, given the court's conclusions with regard to commonality and typicality, as well as the following discussion of the requirements of Rule 23(b), the court sees no need at this time to engage in a full analysis of the adequacy requirement and will not rely on that requirement in denying Plaintiffs' motions.

### F. Requirements of Rule 23(b)

Because Plaintiffs must satisfy the requirements of both Rule 23(a) and Rule 23(b) to achieve class certification, the court's foregoing conclusions dispose of the certification issue. Nonetheless, assuming *arguendo* that Plaintiffs could meet all of their Rule 23(a) obligations, their motions still fail because none of the proposed classes is certifiable under Rule 23(b). For the following reasons, the court finds that Plaintiffs cannot achieve class certification under the requirements of either Rule 23(b)(2) or Rule 23(b)(3), nor will the court certify a class under Plaintiffs' proposed "hybrid" approach.

### 1. Certification Under Rule 23(b)(2)

■ Plaintiffs first urge the court to certify their proposed classes under Rule 23(b)(2). That provision allows the maintenance of a class action where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R.Civ.P. 23(b)(2). Although the rule expressly speaks only in terms of injunctive and declaratory relief, "[m]onetary relief may be obtained in a Rule 23(b)(2) class action so long as the predominant relief sought is injunctive and declaratory." *Murray v. Auslander,* 244 F.3d 807, 812 (11th Cir.2001).[31]

---

30. With their replies, Plaintiffs have submitted the affidavit of attorney Keith Givens to bolster their contentions regarding the adequacy of counsel. *See* Pl.Ex. 105. As a general rule, a party may not submit evidence with a reply that was available but not included with the original motion.

31. "Prior to 1991, only equitable relief, primarily back pay, was available to prevailing Title VII plaintiffs; the statute provided no authority for an award of punitive or compensatory damages." *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 533–34, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). With the passage of the Civil Rights Act of 1991, Title VII plaintiffs may now seek both compensa-

"[M]onetary relief predominates in (b)(2) class actions unless it is *incidental* to requested injunctive or declaratory relief." *Id.* (alteration and emphasis in original) (quoting *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir.1998)). In the instant actions, Plaintiffs seek monetary relief in the form of "front and back pay, lost fringe benefits, including any lost benefits that would have otherwise been included in the 401(k) pension plans of Plaintiffs and the class," *see* Pl. Complaints, Prayers For Relief, ¶ d, as well as "compensatory damages, emotional distress damages, pain and suffering damages, and punitive damages." *See id.* at ¶ e. Because Plaintiffs clearly seek monetary relief on behalf of the putative classes, the question becomes whether the monetary relief sought is incidental to any injunctive relief also requested.

In *Murray*, the Eleventh Circuit was confronted with the same question in the context of a Rule 23(b)(2) class action alleging disability discrimination. At issue in that case was whether the plaintiffs' claims for compensatory damages, which sought to remedy the plaintiffs' "pain and suffering, mental anguish, and humiliation," were incidental to their claims for injunctive and declaratory relief. *See Murray*, 244 F.3d at 812. Noting that it had not previously established specific criteria for determining when monetary relief is incidental to equitable relief, the court turned to the Fifth Circuit's opinion in *Allison* for guidance. Quoting *Allison*, the court in *Murray* explained:

> By incidental, we mean damages that flow directly from liability to the class *as a whole* on the claims forming the basis of the injunctive or declaratory relief .... Ideally, incidental damages should be only those to which class members automatically would be entitled once liability is established .... Liability for incidental damages should not ... entail complex individualized determinations. Thus, incidental damages will, by definition, be more in the nature of a group remedy, consistent with the forms of relief intended for (b)(2) class actions.

tory and punitive damages. *See id.; see also* 42

*Id.* (alterations and emphasis in original) (quoting *Allison*, 151 F.3d at 415). Under this standard, the court held that the plaintiffs did not seek damages as a group remedy but rather as a remedy for "inherently individual injuries" that would "compel[ ] an inquiry into each class member's individual circumstances." *Id.* Accordingly, the plaintiffs sought damages "to which they would not be automatically entitled even if [the defendants'] liability to the class [was] established," and the district court abused its discretion by certifying a Rule 23(b)(2) class that encompassed the plaintiffs' damages claims. *Id.*

As in *Murray*, Plaintiffs' claims for compensatory damages in the instant cases are not incidental to their claims for injunctive relief and therefore may not be certified in a class action under Rule 23(b)(2). Like the plaintiffs in *Murray*, Plaintiffs here seek damages to remedy their alleged emotional distress and pain and suffering, injuries that are "inherently individual." *See Murray*, 244 F.3d at 812. Moreover, similar to *Murray*, assessing damages for these injuries would necessitate an inquiry into the specific circumstances of each individual class member. *See id. See also Lemon v. International Union of Operating Eng'rs, Local No. 139*, 216 F.3d 577, 581 (7th Cir.2000) (explaining that claim for damages under Title VII "depends on an individualized analysis of each class member's circumstances and requires additional hearings to resolve the disparate merits of each individual's case"); *Allison*, 151 F.3d at 417–18 (stating that "[t]he very nature of these damages ... necessarily implicates the subjective differences of each plaintiff's circumstances" thereby "requiring individualized proof of discrimination and injury to each class member"). Thus, the compensatory damages sought by Plaintiffs are not incidental to the requested injunctive relief, and certification under Rule 23(b)(2) is inappropriate.

Ignoring the significance *Murray* has on the instant cases, Plaintiffs rely extensively on the Eleventh Circuit's decision in *Holmes v. Continental Can Co.*, 706 F.2d 1144 (11th Cir.1983). In that case, the district court

U.S.C. § 1981a(b).

certified a Rule 23(b)(2) class for purposes of approving a settlement of the plaintiffs' employment discrimination claims. Under the terms of the settlement, the plaintiff class received not only injunctive and declaratory relief, but also a lump sum back pay award of $43,775. Approximately one-half of this back pay award was to be received by the eight named plaintiffs, with the other half being distributed among the remaining 118 members of the class. A substantial number of the class members objected to the method of distributing the back pay award, and they appealed the settlement to the Eleventh Circuit. *See id.* at 1146–47.

Finding that the back pay allocation was facially unfair and that the evidentiary record was not adequately developed to overcome that unfairness, the court of appeals first reversed the district court's approval of the settlement and remanded for further proceedings. *See id.* at 1148–51. The court then held that the district court abused its discretion by not affording an opt-out procedure to members of the settlement class. The court began by acknowledging that the class was properly certified under Rule 23(b)(2) and that an award of back pay was cognizable under that provision because it was "an integral part of [Title VII's] statutory equitable remedy." *Id.* at 1152. Nonetheless, finding that the monetary relief at issue was "functionally more similar to a(b)(3) class than to a(b)(2) class," the court concluded that "the opt out procedure of (b)(3) must be applied." *Id.* at 1155. The court explained its conclusion by stressing the differences between the Rule 23(b)(2) and Rule 23(b)(3) mechanisms. Rule 23(b)(2) by its very nature contemplates claims on behalf of a homogeneous and cohesive class, "claims resting on the same grounds and applying more or less equally to all members of the class." *Id.* Accordingly, the relief envisioned by Rule 23(b)(2) is that which remedies an injury to the class as a whole. *Id.* Back pay constitutes such relief because it is equitable in nature and can be determined by the discretion of the court without the need for a jury. *See id.* at 1152. Money damages, by contrast, "are directly related to the disparate merits of individual claims and are not generally applicable to the claims of the class

as a whole." *Id.* at 1156 (internal quotations omitted). As such, cases seeking money damages are more properly certified under Rule 23(b)(3), which envisions a class more heterogeneous in nature. *Id.* Because of this heterogeneity, however, Rule 23(b)(3) requires findings that common issues predominate over individual issues and that class treatment is superior "to all other available methods for the fair and efficient adjudication of the dispute," findings not required under Rule 23(b)(2). *Id.* Moreover, Rule 23(b)(3) classes require certain procedural safeguards, such as notice and opt-out rights, that are not normally provided in Rule 23(b)(2) class actions. *Id.* Pursuant to the method of distribution approved by the district court, the named plaintiffs received substantially more back pay than did the other members of the class, which reduced the cohesion of the class by blurring somewhat the distinction between class-wide equitable relief and individual compensatory damages. *Id.* at 1159–60. Accordingly, the court required that opt-out rights be given to the members of the settlement class. *Id.* at 1160.

Plaintiffs assert that *Holmes* allows their damages claims to be certified in a Rule 23(b)(2) class action. The court disagrees. First, *Holmes* was concerned only with claims for equitable monetary relief awarded by virtue of a settlement agreement. That decision did not address, nor did it have any occasion to address, claims for legal monetary remedies such as compensatory damages that would be tried to a jury. Therefore, *Holmes* is inapposite to the issue currently facing this court. Second, if anything, the decision in *Holmes* reinforces that Plaintiffs' claims for compensatory damages are not properly included in a Rule 23(b)(2) class action. By stressing the need for cohesion and homogeneity under Rule 23(b)(2), and by pointing out the differences between back pay and money damages, the court in *Holmes* demonstrated that a Rule 23(b)(2) class action is not the proper device for seeking individualized legal remedies. Although the *Holmes* court expressed concern that the method of allocation at issue in that case somewhat blurred the distinc-

tion between back pay and money damages, the relief was still equitable in nature, determined by the court and designed to remedy a ·common injury suffered by all the class members.

The distinction between back pay and money damages is not inconsequential. Once liability is established in an employment discrimination class action certified under Rule 23(b)(2), each member of the class, solely by virtue of being a member of the class, is entitled to equitable remedies designed to make him or her "whole." *See Holmes,* 706 F.2d at 1157 (stating that finding of liability on claims common to class results in equitable relief). An award of back pay, although somewhat individualized, falls within the class of remedies available because it is "subsumed by the traditional equitable concepts of reinstatement and restitution," which apply to the class in common. *Williams v. Owens–Illinois, Inc.,* 665 F.2d 918, 929 (9th Cir.1982). *See also Allison,* 151 F.3d at 415 (describing back pay as "equitable remedy similar to other forms of affirmative injunctive relief"). Not so with the damages sought by Plaintiffs here. Compensatory damages "are anything but equitable in nature; they are, in fact, the very definition of *legal* relief." *Rutstein v. Avis Rent–A–Car Systems, Inc.,* 211 F.3d 1228, 1239 (11th Cir. 2000). Thus, to obtain compensatory damages, especially for emotional distress, "individual plaintiffs must prove that 'injury actually was caused.'" *Id.* (quoting *Carey v. Piphus,* 435 U.S. 247, 264, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)). For this reason, unlike back pay, compensatory damages are not automatically available to class members "even if Defendants' liability to the class is established." *Murray,* 244 F.3d at 812.[32]

The same is true with regard to Plaintiffs' claims for punitive damages. To recover punitive damages on their Title VII claims, Plaintiffs must show that Defendants acted "with malice or with reckless indifference to the federally protected rights of an aggrieved *individual.*" 42 U.S.C. § 1981a(b)(1) (emphasis added); *see also*

*Kolstad,* 527 U.S. at 534, 119 S.Ct. 2118. The statute plainly requires a fact-specific inquiry into the circumstances of the individual plaintiff, *see Lemon,* 216 F.3d at 581, and punitive damages therefore "cannot be assessed merely upon a finding that the defendant engaged in a pattern or practice of discrimination." *Allison,* 151 F.3d at 417. Furthermore, any punitive damages awarded to Plaintiffs must bear a reasonable relationship to their compensatory damages. *See BMW of N. America, Inc. v. Gore,* 517 U.S. 559, 580–83, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). The amount of punitive damages Plaintiffs may obtain therefore depends directly on the amount of compensatory damages recovered, and "being dependent on non-incidental compensatory damages, punitive damages are also non-incidental." *Allison,* 151 F.3d at 418.

In sum, Plaintiffs' claims for compensatory and punitive damages seek to remedy inherently individual injuries and can be recovered only after examining the particular circumstances of each individual class member. These claims are not properly sought as a group remedy and are not incidental to the injunctive relief prayed for in Plaintiffs' complaints. As such, certification of the proposed classes under Rule 23(b)(2) is not appropriate.

2. *Certification Under Rule 23(b)(3)*

■ Plaintiffs also urge the court to certify their proposed classes under Rule 23(b)(3), which allows the maintenance of a class action if "the court finds that the questions of law or fact common to the members of the class predominate over any other questions affecting only individual members, and that a class action is superior to other available methods for fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). A non-exhaustive list of matters pertinent to the required findings of predominance and superiority are delineated in the rule: (a) "the interest of members of the class in individually controlling the prosecution or defense of separate actions"; (b) "the extent and nature of any litigation concern-

---

**32.** Moreover, "establishing the amount of compensatory damages due each plaintiff is a far more complex and uncertain exercise than the determination of back pay, and greatly complicates the management of a class action." *Williams,* 665 F.2d at 929.

ing the controversy already commenced by or against members of the class"; (c) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (d) "the difficulties likely to be encountered in the management of a class action." Fed.R.Civ.P. 23(b)(3)(A)-(D). *See also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615–16, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). As mentioned above, Rule 23(b)(3) classes are generally heterogeneous in nature, and the predominance and superiority requirements, which are not found in Rule 23(b)(2), reflect that heterogeneity. Also, because classes certified under Rule 23(b)(3) lack the inherent cohesion of Rule 23(b)(2) classes, individual notice to all class members is required, and each class member must be provided with the opportunity to opt out of the class litigation. *See* Fed.R.Civ.P. 23(c)(2); *Holmes*, 706 F.2d at 1156. Plaintiffs assert that their proposed classes satisfy Rule 23(b)(3)'s requirements because the common question of Defendants' alleged pattern and practice of discrimination predominates over individual issues and because resolution of their claims in class litigation is superior to hundreds of individual lawsuits. The court disagrees.

The court begins its analysis of these issues by reviewing the Fifth Circuit's decision in *Allison*, an employment discrimination case very similar to the ones brought by Plaintiffs here. The plaintiffs in *Allison* brought suit on behalf of black employees and applicants of the defendant employer, alleging that the defendant engaged in class-wide race discrimination "with respect to general hiring, promotion, compensation, and training policies." *Allison*, 151 F.3d at 407. The plaintiffs moved for class certification, which motion was denied by the district court, and the Fifth Circuit affirmed. After first determining that the plaintiffs could not achieve class certification under Rule 23(b)(2) due to their claims for damages, the court turned its attention to the requirements of Rule 23(b)(3). The court concluded that the plaintiffs could not meet the rule's predomination requirement because their claims for compensatory and punitive damages focused "almost entirely on facts and issues specific to individuals rather than the class as a

whole." *Id.* at 419. Examples of such facts and issues included: "what kind of discrimination was each plaintiff subjected to; how did it affect each plaintiff emotionally and physically, at work and at home; [and] what medical treatment did each plaintiff receive and at what expense." *Id.* Because of these individual issues, the court explained, "an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried." *Id.* (internal quotations omitted). This degeneration, in turn, diminished the superiority of the class action device for adjudicating the plaintiffs' claims by creating numerous manageability problems. The requirement that the claims be tried to a jury exacerbated those problems. *Id.* at 419–20. Therefore, despite their contention that the defendant engaged in a pattern and practice of discrimination common to all black employees, the plaintiffs' claims actually depended on the resolution of individual issues, and certification under Rule 23(b)(3) was improper. *Id.* at 420.

Similar conclusions were reached by the Eleventh Circuit in two decisions addressing discrimination claims outside of the employment context. *See Avis*, 211 F.3d 1228 (11th Cir.2000); *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999 (11th Cir.1997). In *Jackson*, the plaintiffs alleged that the defendant had "a nationwide practice or policy of discriminating against its customers and its employees on the basis of race." *Jackson*, 130 F.3d at 1001. Specifically, the plaintiffs asserted, first, that the defendant either refused to provide them with accommodations or provided them with substandard accommodations, and second, that the defendant's discrimination against blacks created a retaliatory and hostile work environment. The district court entered an order allowing communication with potential class members, and it subsequently certified a class with regard to the plaintiffs' customer-based claims. The question of class certification with regard to the plaintiffs' employment-based claims was referred to a magistrate judge. The defendant sought relief from these orders via a petition for mandamus in the Eleventh Circuit. *Id.* at 1001–03. The court of appeals granted the writ, directing the district court

to vacate its order concerning class communications and to decertify the customer class. Rejecting the plaintiffs' argument that the defendant's alleged pattern and practice of discrimination satisfied Rule 23(b)(3)'s predominance requirement, the court explained that the plaintiffs' claims would "require distinctly case-specific inquiries into the facts surrounding each alleged incident of discrimination." *Id.* at 1006. Indeed, the court expressed its expectation that "most, if not all, of the plaintiffs' claims [would] stand or fall, not on the answer to the question whether [the defendant] ha[d] a practice or policy of racial discrimination, but on the resolution of these highly case-specific factual issues." *Id.* The court advanced a similar opinion as to the not-yet certified employee class, expressing its doubt that the pattern and practice issue common to the class would predominate over "those issues that are subject only to individualized proof." *Id.* at 1008.

In *Avis,* the Eleventh Circuit again addressed the requirements of Rule 23(b)(3) where the plaintiffs alleged systemic discrimination. The *Avis* plaintiffs alleged that the defendant, pursuant to a pattern and practice of racial discrimination, had refused to give the plaintiffs corporate accounts on the basis of their Jewish ancestry. The district court certified a class under Rule 23(b)(3). *See Avis,* 211 F.3d at 1230-33. Relying on its prior decision in *Jackson,* the Eleventh Circuit reversed. As in *Jackson,* the court concluded that common issues did not predominate because each plaintiff bore the burden of establishing "that he or she suffered from intentional discrimination," and liability therefore rested on individualized and case-specific issues. *Id.* at 1235. In drawing this conclusion, the court specifically rejected the plaintiffs' argument that the defendant's alleged pattern and practice of discrimination, common to all of the class members, predominated over any individual issues. After listing several issues pertinent to each plaintiff's individual case, the court explained:

> The importance of these individualized issues, relative to the one common issue of whether [the defendant] maintains a policy or practice of discrimination, is amplified by the fact that even if plaintiffs can demonstrate that a general policy or practice

of discrimination was applied in their cases, [the defendant] can escape liability by showing that an individual plaintiff would have been denied or terminated even if no such policy or practice had existed.

*Id.* at 1236.

The *Avis* court also rejected the plaintiffs' argument that the Supreme Court's decision in *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), compelled a different result. The court recognized that under *Teamsters* and its progeny, once a discriminatory pattern or practice is established in an employment discrimination class action, a presumption arises that the individual members of the class have been discriminated against in accordance with that pattern or practice. *See Avis,* 211 F.3d at 1236-37. *See also Teamsters,* 431 U.S. at 361-62, 97 S.Ct. 1843. Nonetheless, the court in *Avis* found two important differences between *Teamsters* and the case before it. First, the court distinguished *Teamsters* by pointing out that the case before it did not allege employment discrimination. The court noted that the *Teamsters* presumption applies in employment discrimination cases only as a substitute for a plaintiff's *prima facie* burden of showing that he or she was qualified for the job. *See Avis,* 211 F.3d at 1238 ("*Teamsters* therefore stands for the proposition that where a plaintiff class can demonstrate a policy or practice of discrimination so pervasive that a court is justified in concluding that qualifications were entirely irrelevant to the employer ... then individual plaintiffs are relieved of the *prima facie* burden of demonstrating that they were qualified for the job at issue in subsequent individual proceedings."). In the case before it, however, the plaintiffs had to show "an actual intent to discriminate against an individual plaintiff on the basis of his or her ethnicity," and a finding that the defendant had a pattern or practice of discrimination was not a "meaningful substitute" for that element of the plaintiffs' case. *Id.* at 1239. Second, and according to the court "more important," the relief to which a plaintiff class is entitled after a finding of a discriminatory pattern or

practice is equitable in nature. The court specifically found the *Teamsters* framework inappropriate in the case before it "because the establishment of a policy or practice of discrimination *cannot* trigger the defendant's liability for damages to all the plaintiffs in the putative class." *Id.* (emphasis added). Instead, to recover damages, each plaintiff would "have to prove that [he or she] suffered some injury," and "[t]he idea that individual injury could be settled on a class-wide basis [was] preposterous." *Id.*

The foregoing cases demonstrate that Plaintiffs' claims cannot satisfy the predominance and superiority requirements of Rule 23(b)(3). As in *Allison, Jackson,* and *Avis,* the resolution of Plaintiffs' discrimination claims in the instant case will require the court to focus on the individual circumstances of each member of the plaintiff class. As all three of the cited decisions attest, entitlement to the compensatory and punitive damages pled in Plaintiffs' complaints will not derive merely from a finding that Defendants engaged in a pattern and practice of racial discrimination. But it is not the matter of damages alone that renders certification under Rule 23(b)(3) inappropriate. The true problem with certifying Plaintiffs' discrimination claims under Rule 23(b)(3) concerns not merely a question of relief but a question of liability itself. Claims of discrimination, in employment or elsewhere, depend heavily on the specific circumstances and conditions in which the victim finds himself or herself. An individual's qualifications, experience, and background for a particular job or contract must be considered in any case where discrimination is alleged. *See Avis,* 211 F.3d at 1235 (listing age, financial criteria, expected use of rented vehicles, geographic area, and veracity of applicant as individual issues relevant to plaintiffs' discrimination claim); *Jackson,* 130 F.3d at 1006 (listing availability of vacant rooms, lack of reservations, and other non-racial characteristics as individual issues relevant to plaintiffs' discrimination claim); *Communications Workers of America, Local 3603 v. BellSouth Telecommunications, Inc.,* No. 1:99–CV–0857–WBH, 2000 WL 33321176, at *5–6, 85 Fair Empl. Prac.

Cases (BNA) 596, 2000 U.S. Dist. LEXIS 20729, at *19–20 (N.D.Ga. Oct. 27, 2000) (Hunt, J.) (listing qualifications, experience, seniority, training, employment record, and employer's specific reasons for not selecting a particular employee as individual issues defeating class certification of plaintiffs' employment discrimination claim). Such individual issues are present in every employment discrimination claim regardless of the type of relief sought, although claims for damages certainly enhance such issues. This is especially true where the plaintiffs' claims involve allegations of discrimination in promotions and hostile work environment, which are by their very nature extremely individualized and fact-intensive claims. Moreover, even where a pattern and practice of discrimination has been proven, the employer still has the right to demonstrate that it would have treated any given member of the plaintiff class exactly as it did absent the discrimination. *See Teamsters,* 431 U.S. at 362, 97 S.Ct. 1843 (explaining that, after showing of discriminatory policy is made, "the burden then rests on the employer to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons"). In short, a claim of employment discrimination focuses on "the reason for a particular employment decision," *Cooper v. Federal Reserve Bank,* 467 U.S. 867, 876, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984), and "[q]uestions affecting individual [class] members, such as how they were discriminated against and how it affected them individually, involve not merely separate issues concerning damages, but differences in whether individual members can prove their claims." *Faulk v. Home Oil Co.,* 186 F.R.D. 660, 664 (M.D.Ala.1999) (Albritton, J.). Under such circumstances, the common issues concerning a defendant's pattern or practice of discrimination will not always predominate over the individual, case-specific questions relevant to each plaintiff's claim, nor will the class mechanism envisioned by Rule 23(b)(3) readily constitute a superior method of adjudication. *See Allison,* 151 F.3d at 419–20 (explaining that individual issues relating to plaintiffs' claims, exacerbated by demand for jury trial, detract

from superiority of class action device).[33]

Pointing out that the court in *Avis* distinguished *Teamsters* on the ground that *Avis* did not involve employment, Plaintiffs nonetheless maintain that the presumption created in *Teamsters* and its progeny renders predominant in these cases the common issue of Defendants' alleged pattern and practice of discrimination. Plaintiffs correctly assert that, even after *Avis*, the *Teamsters* presumption may apply "in private class actions alleging systemic disparate treatment in employment." *Avis*, 211 F.3d at 1237. The cases in which that presumption has been applied or discussed, however, almost uniformly concern certification under Rule 23(b)(2). *See, e.g., Franks v. Bowman Transp. Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Foster v. Board of Sch. Comm'rs*, 872 F.2d 1563 (11th Cir.1989); *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546 (11th Cir.1986); *Freeman v. Motor Convoy, Inc.*, 700 F.2d 1339 (11th Cir.1983). Because that rule contains no predomination or superiority requirements, the individual issues that are inherent in a claim of employment discrimination do not defeat certification under Rule 23(b)(2). As demonstrated, however, the primary relief sought in a Rule 23(b)(2) case must be injunctive or declaratory. Until 1991, this requirement was routinely satisfied in employment discrimination cases because only equitable relief was available to Title VII plaintiffs. There was, therefore, little need to attempt certification under Rule 23(b)(3), and the courts rarely had occasion to analyze the predominance of individual or common issues in cases alleging violations of Title VII.

In contrast to pre–1991 litigation, compensatory and punitive damages are now available in Title VII cases. Because Plaintiffs seek legal damages in the instant cases, certification under Rule 23(b)(2) is not appropriate, as discussed above. Plaintiffs must therefore achieve certification, if at all, within the confines of Rule 23(b)(3), which requires a showing that common issues predominate over individual ones. Thus, the individual issues relating to Plaintiffs' employment discrimination claims are relevant to class certification under Rule 23(b)(3) in a way that they are not under Rule 23(b)(2). This point is implicit in the second, "more important" distinction made by the *Avis* court, a distinction wholly ignored by Plaintiffs: that the *Teamsters* presumption entitles individual plaintiffs only to equitable relief but does not trigger liability for individual damages. In other words, the *Teamsters* presumption applies chiefly in Rule 23(b)(2) cases, where the primary relief available remains equitable in nature and the particularized issues inherent in employment discrimination claims matter little to the class certification decision. Once under the framework of Rule 23(b)(3), on the other hand, these same issues present intrinsic problems for class certification that must be overcome by those seeking certification, no matter what type of relief is sought. The emphases on damages found in *Avis* and *Allison* reflect the fact that, practically speaking, there is no reason to conduct a Rule 23(b)(3) analysis where the plaintiffs seek only equitable relief. Because Plaintiffs seek more in these cases, the court must evaluate the many particularized issues involved, and under the circumstances presented by these cases, such issues defeat Rule 23(b)(3) certification.[34]

In sum, Plaintiffs cannot achieve class certification under Rule 23(b)(3) because the

---

33. It is also important to remember that, pursuant to the Civil Rights Act of 1991, an injured employee has the possibility of obtaining up to $300,000 in compensatory and punitive damages on his or her Title VII claim. *See* 42 U.S.C. § 1981a(b)(3). The potential damages for violations of § 1981 are not limited. In light of the substantial recoveries available to each putative class member in his or her individual lawsuit, "the most compelling justification for a Rule 23(b)(3) class action . . . the possibility of negative value suits . . . is absent in this case." *Avis*, 211 F.3d at 1241 n. 21 (citations omitted).

34. The court has no occasion to decide that the problems associated with the individual issues inherent in discrimination claims will in all circumstances defeat certification under Rule 23(b)(3). Rather, the court simply notes that claims of employment discrimination, by their very nature, present individualized issues that create obstacles for achieving certification under the Rule 23(b)(3) framework. In the instant cases, those obstacles have not been overcome. Under what circumstances they might be overcome is not an issue before this court.

individual issues relating to their employment discrimination claims predominate over the common issue of Defendants' alleged discriminatory pattern and practice. Additionally, the presence of these particularized issues diminishes the manageability of any class litigation and would result in a series of essentially separate lawsuits. As such, a class action is not superior to other available methods of adjudication For these reasons, certification under Rule 23(b)(3) is not appropriate.

### 3. *Hybrid Certification Under Both Rule 23(b)(2) and Rule 23(b)(3)*

Finally, Plaintiffs urge the court to certify a "hybrid" class, whereby their claims for injunctive relief are certified under Rule 23(b)(2) and their claims for damages are certified under Rule 23(b)(3). As demonstrated, Plaintiffs' discrimination claims are not amenable to certification under Rule 23(b)(3) because individual issues predominate and because class adjudication is not superior to other available methods. Severing Plaintiffs' claims for injunctive relief does not remedy these problems. Accordingly, Plaintiffs' proposed "hybrid" certification is not warranted.

■ There remains, however, the issue of certifying only Plaintiffs' claims for equitable relief under Rule 23(b)(2). *See Murray,* 244 F.3d at 812 (implying that Rule 23(b)(2) class may be maintained if damages claims are exempted). The court finds that the Seventh Amendment prohibits such a course of action in the instant cases. The Seventh Amendment preserves the right to a jury trial "in Suits at common law." U.S. Const. amend. VII. Although the amendment specifically mentions suits at common law, the Supreme Court has made clear that the right to jury trial applies in any suit "in which legal rights [are] to be ascertained and determined, in contradistinction to those where equitable rights alone [are] recognized, and equitable remedies [are] administered." *Ross v. Bern-*

*hard,* 396 U.S. 531, 533, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970) (quoting *Parsons v. Bedford, Breedlove & Robeson,* 28 U.S. 433, 447, 3 Pet. 433, 7 L.Ed. 732 (1830)). *See also Waldrop v. Southern Co. Services, Inc.,* 24 F.3d 152, 156 (11th Cir.1994) ("The amendment extends the right to a jury trial to all suits where legal rights are involved, whether at common law or arising under federal legislation."). Because the Civil Rights Act of 1991 expressly grants both plaintiffs and defendants the right to demand a jury trial when compensatory and punitive damages are sought in Title VII cases, *see* 42 U.S.C. § 1981a(c), and because both sides have so demanded in the instant cases, a jury trial is required with regard to Plaintiffs' claims for damages.

Many of the factual issues relevant to Plaintiffs' damages claims, however, are also relevant to Plaintiffs' equitable claims. As such, the litigants have the right to a determination of these issues by a single jury. *See Ross,* 396 U.S. at 538–39, 90 S.Ct. 733 ("[W]here equitable relief and legal claims are joined in the same action, there is a right to jury trial on the legal claims which must not be infringed either by trying the legal issues as incidental to the equitable ones or by a court trial of a common issue existing between the claims."); *Alabama v. Blue Bird Body Co.,* 573 F.2d 309, 318 (5th Cir.1978) (recognizing that Seventh Amendment guarantees "the general right of a litigant to have only one jury pass on common issues of fact"). Adjudication would therefore require one jury to resolve the many individual and case-specific issues relating to Plaintiffs' employment discrimination claims prior to any ruling by the court with regard to equitable remedies. *See generally Allison,* 151 F.3d at 423–25 (explaining difficulties in partial certification of equitable claims). *See also Miller v. Hygrade Food Prods. Corp.,* 198 F.R.D. 638, 644 (E.D.Pa.2001); *Ramirez v. DeCoster,* 194 F.R.D. 348, 354 (D.Me.2000).[35] The court finds that such a task would be overly

---

35. This is true even if the court certifies only Plaintiffs' equitable claims because, with regard to the back pay issue, Defendants still have the right to rebut the presumption that the adverse employment action was due to discrimination and to show that individual members of the class are not entitled to back pay. *See Teamsters,* 431 U.S. at 362, 97 S.Ct. 1843; *Holmes,* 706 F.2d at 1157–58. Because these issues are interwoven with the liability issues on Plaintiffs' damages claims, the same jury would have to resolve all of these issues.

cumbersome and would result in litigation characterized by confusion and incoherency.

## III. CONCLUSION

For all of the foregoing reasons, the court DENIES Plaintiffs' motions for class certification [123-1; 191-1]. The individual Plaintiffs, of course, may maintain these actions pursuing their own individual claims, and the members of the putative classes similarly may file lawsuits advancing their own individual claims.